310 So.2d 550 (1975)
Thomas Perry EUBANKS, Jr.
v.
Isaac BRASSEAL et al.
No. 55479.
Supreme Court of Louisiana.
March 31, 1975.
*551 Paul H. Due, Due & Dodson, Baton Rouge, for plaintiff-applicant.
R. L. Davis, Jr., Theus, Grisham, Davis & Leigh, Monroe, for defendants-respondents.
MARCUS, Justice.
Thomas Perry Eubanks, Jr. filed suit for damages for personal injuries sustained when a one-ton truck he was driving was struck from the rear by a large truck-trailer unit loaded with gasoline and driven by Isaac Brasseal. Made defendants were Brasseal, his employer, and the latter's insurer, who denied Brasseal was negligent and, alternatively, alleged that plaintiff was contributorily negligent. The trial court found that the accident was caused solely by the negligence of plaintiff and rendered judgment dismissing plaintiff's suit at his cost. The court of appeal found plaintiff negligent and, pursuant to defendants' special plea of contributory negligence, affirmed the judgment of the trial court. Eubanks v. Brasseal, 300 So.2d 500 (La.App. 2d Cir. 1974). Upon application of plaintiff, we granted a writ of certiorari to review the judgment of the court of appeal. 302 So.2d 614 (La.1974).
The facts underlying this controversy are essentially undisputed. The collision occurred at about 3:30 p. m. on U.S. Highway 165, a two-lane roadway, in Caldwell Parish. It was raining, and the surface of the highway was slick. The specific location of the accident was on the Riverton overpass which is a distance of about 20 miles south of Monroe. The terrain in the vicinity of the overpass was flat, and the overpass was constructed on large mounds of dirt on each side of the railroad track, with a bridge being built to connect the space between the mounds.
Plaintiff had passed Brasseal at a red light in Monroe, and both vehicles proceeded south on Highway 165, with plaintiff in the lead vehicle. Plaintiff did not recall seeing Brasseal after having passed him in Monroe. Plaintiff had been traveling at approximately 50-55 miles per hour as he approached the overpass. As he reached the crest of the overpass, he observed a police vehicle with blue flashing lights coming from the opposite direction. His first reaction was that there had been an accident. Accordingly, he immediately began slowing his truck. He continued southward and, as he reached the vehicle with the flashing lights, he discovered it was a sheriff's department car leading a funeral procession. By this time, he had slowed down to about 15 miles per hour. Upon reaching half-way down the overpass, he looked into his rear view mirror and saw defendant truck bearing down on *552 him. The police vehicle was about three car lengths past his truck. He shifted from fourth to third gear in an attempt to accelerate and avoid the accident. However, realizing that there was no time to avoid the collision, he grabbed his young son, who was riding next to him. At this point, plaintiff's vehicle was struck in the rear by the tank truck. The impact thrust plaintiff's head against the rear window. As a result of the collision, plaintiff now complains of persistent headaches and disabling and painful back injuries.
According to defendant, he had been traveling behind plaintiff at a similar speed (50-55 miles per hour). He estimated that he was about a city block or 100 yards behind plaintiff when he observed plaintiff pass the police vehicle near the top of the overpass and, seeing the flashing blue lights, let off the accelerator to slow his vehicle. As he passed the crest of the overpass at a speed of approximately 35 miles per hour, he saw plaintiff's vehicle in his lane of traffic about 75 yards away, or half-way down the incline, and realized that he was about to overtake it. When he applied the brakes of the truck, the trailer, which was filled to its capacity of 8,250 gallons of gasoline and weighed about 50,000 pounds (total weight of loaded tank truck was about 72,000 pounds), began to jackknife. He released the brake and swung the trailer back under control. He tried to apply the brakes twice more, but the trailer continued to jackknife, forcing him to release the brakes each time. This procedure slowed the speed of the tank truck to approximately 10-15 miles per hour when the collision occurred at the foot of the overpass. It is clear from the evidence taken as a whole that Brasseal traveled a distance of about 700 feet between the point at which he observed plaintiff's vehicle when he (Brasseal) was on top of the overpass and the point of impact.
The court of appeal affirmed the trial court's dismissal of plaintiff's suit without consideration of defendant Brasseal's negligence. Rather, the court of appeal found plaintiff's negligence consisted primarily of his violation of R.S. 32:64, which prohibits the operation of a motor vehicle "... at such a slow speed as to impede the normal and reasonable movement of traffic...," except when a special hazard exists that requires a slow speed. This breach of care was said to constitute negligence, and, upon finding that this negligence contributed to the accident, the court of appeal denied recovery on the ground that, even if the defendant Brasseal was found negligent, the plaintiff's contributory negligence would bar his recovery. We disagree with the conclusions of the court of appeal.
Plaintiff urges that R.S. 32:125(A) prescribes the appropriate procedure to be followed by a motorist upon the approach of an emergency vehicle. The statute provides in pertinent part:
Upon the immediate approach of an authorized emergency vehicle making use of audible and visual signals, or of a police vehicle properly and lawfully making use of an audible signal only, the driver of every other vehicle shall yield the right of way and shall immediately drive to a position parallel to, and as close as possible to, the right hand edge of curb of the highway clear of any intersection, and shall stop and remain in such position until the authorized emergency vehicle has passed, except when otherwise directed by a police officer.
(Emphasis added.) The defendants urge that, in view of uncontradicted testimony that the approaching police vehicle was not sounding its siren, there was no audible signal, and the statute is not applicable.
While we agree the statute is not technically applicable to require that the plaintiff stop his vehicle next to the curb, R.S. 32:125(A) is certainly indicative of the legislative intent that, upon the approach of similar emergency vehicles, motorists should at least reduce the speed of *553 their vehicle and proceed with due caution. This is corroborated by the exception made to R.S. 32:64, the "slow speed" statute, that allows a motorist to slow his vehicle when a "special hazard" exists. Accordingly, in our view, the approach of the police car in such a manner indicated to plaintiff that a potentially dangerous situation existed, in response to which he properly reduced his speed. The slowing of his vehicle was not excessive; rather, the rate of speed was entirely reasonable, considering the condition of the road on a rainy day and the unavailability of a road shoulder on the overpass by which to escape the potential hazard. Moreover, we do not find, contrary to the court of appeal, that plaintiff maintained his slow rate of speed for an inordinately long period of time, as the accident occurred almost immediately after he slowed his vehicle. Thus, we are unable to say that plaintiff's actions under these circumstances constituted negligence.
Having determined that plaintiff's actions do not bar his recovery, we must determine whether the defendant was at fault and caused the accident. At the outset, R.S. 32:81 furnishes the standard of care required of motorists following other vehicles. The statute provides in pertinent part:
The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicle and the traffic upon and the condition of the highway.

. . . . . .
In interpreting this statute, the courts of appeal have determined that a following motorist who strikes a preceding motorist from the rear is presumed to have breached the standard of conduct prescribed in R.S. 32:81 and, hence, is presumed negligent. Thus, the burden rests upon the following motorist to exonerate himself.[1] This interpretation rests in the settled theory that, where a traffic law is designed to protect life and property, it is a safety measure, the violation of which is negligence per se and is actionable if it was a legal cause of the collision.[2]
Bearing this burden to exculpate himself, defendant Brasseal must establish that he kept his vehicle under control, closely observed the forward vehicle and followed at a safe distance under the circumstances. Following motorists have escaped liability for rear end collisions by establishing that the forward vehicle, encountered in the dark, was stalled and unlighted[3] or that the unpredictable driving of the preceding motorists created a sudden emergency that the following motorists could not reasonably have anticipated.[4] Hence, Brasseal contends that the actions of plaintiff in slowing his truck at the approach of the police vehicle and continuing at that rate of speed on the downhill side of the rain-slick overpass created a virtual trap for him that he could not reasonably have foreseen. Thus, he argues that he has overcome the presumption of negligence against him.
We disagree. As noted above, the actions of plaintiff were reasonable and proper under the circumstances. On the other hand, we find that Brasseal failed to satisfy the standard of conduct in R.S. 32:81 in that he followed the Eubanks vehicle "... more closely than is reasonable and prudent, having due regard for *554 the speed of such vehicle and the traffic upon and the condition of the highway." It was raining, and the slick condition of the road was apparent. Brasseal first observed the approach of the police vehicle with the flashing blue lights at a distance of about 100 yards as he began to ascend the overpass. While he immediately let off the accelerator and reduced his speed, he was unable to avoid rear ending plaintiff's vehicle despite the fact that he had observed plaintiff's vehicle in a position of peril at a point some 700 feet prior to the impact. The fact that he was operating a 72,000 pound vehicle loaded with a highly inflammable substance should have increased his care under the circumstances. We conclude that Brasseal had ample time to stop his tank truck and avoid the accident had he been maintaining his vehicle under proper control under the circumstances. His failure to do so constitutes, in our opinion, negligence on his part that was the sole proximate cause of the accident. Hence, he is responsible for damages suffered by plaintiff as a result of his fault. La.Civil Code art. 2315 (1870), as amended by Acts 1960, No. 30, § 1.

DECREE
For the reasons assigned, the judgment of the court of appeal is reversed and set aside. Judgment is rendered in favor of the plaintiff, Thomas Perry Eubanks, Jr., and against the defendants, Isaac Brasseal, Rose Oil Company of Dixie, Rose Oil Company Transports, Inc., and the Travelers Insurance Company in such sum as may hereafter be fixed. This case is remanded to the Second Circuit Court of Appeal for assessment of damages. All costs are assessed against defendants.
BARHAM, J., concurs and assigns reasons.
BARHAM, Justice (concurring).
I concur in the finding that plaintiff should recover against the defendants; however, my reasons for permitting recovery differ entirely from the rationale of the majority opinion.
Without analyzing all of the facts, I simply find it impossible to absolve either plaintiff or defendant driver from fault under LSA-C.C. art. 2315. However, having found that both drivers were negligent I find such overwhelming negligence on the part of the defendant, Brasseal, that I must conclude that the plaintiff, who is slightly negligent, should recover damages from the defendants. La.C.C. art. 2323 provides:
"The damage caused is not always estimated at the exact value of the thing destroyed or injured; it may be reduced according to circumstances, if the owner of the thing has exposed it imprudently."
This provision is legislative authority, or if you will, mandate, for comparative negligence in Louisiana.
The French arrived at reduction of damages or comparative negligence without a particularized code provision such as our 2323 through jurisprudence interpreting French Civil Code art. 1382, our Article 2315 2 M. Planiol, Traite elementaire de droit civil (La.St.L.Inst. trans. 1959), No. 899. Most of the world's civil codes provide for a reduction of compensation when the victim of a tort has contributed to it.
The common law established the contributory negligence doctrine in 1809 in Butterfield v. Forester, 11 East 60 (Eng.1809). This inequitable doctrine holds that when there is common fault no matter how greatly the variations and gradations of fault of the parties, neither party can collect any damage from the other party. It allows the one who has been grossly negligent to escape any liability for severe damages on a showing of the slightest negligence on the part of the injured party. Not only is the doctrine inequitable, it is contrary to our specific code mandate. The doctrine of contributory negligence was repudiated in its birthplace, Great Britain, by Act 1945. A growing number of American jurisdictions have statutorily provided for comparative negligence. See *555 Stone, Comparative Negligence, XVII La. Bar Journal 13, 17 (footnote 37), (1969); 16 For the Defense 45, 46 (1975).
Recently, in Hoffman v. Jones, 280 So. 2d 431 (Fla.1973),[1] the Florida Supreme Court without any statutory authority, stated:
"Even if it be said that the present bar of contributory negligence is a part of our common law by virtue of prior judicial decision, it is also true from Duval[2] that this Court may change the rule where great social upheaval dictates. * * *"
The court goes on to note that the legislature had attempted to provide a comparative negligence statute which was vetoed by the governor. The court then said:
"* * * Since that `defeat,' the Legislature has done little to discard the harsh and inequitable contributory negligence rule, perhaps because it considers the problem to be a judicial one.
"Since we definitely consider the problem to be a judicial one, we feel the time has come for this Court to join what seems to be a trend toward almost universal adoption of comparative negligence. A primary function of a court is to see that legal conflicts are equitably resolved. In the field of tort law, the most equitable result that can ever be reached by a court is the equation of liability with fault. Comparative negligence does this more completely than contributory negligence, and we would be shirking our duty if we did not adopt the better doctrine.
"Therefore, we now hold that a plaintiff in an action based on negligence will no longer be denied any recovery because of his contributory negligence." 280 So.2d at 438.
Earlier in my judicial career I expressed the thought that since our legislature had failed in its attempts to pass legislation creating a comparative negligence doctrine, the courts of Louisiana could not be the agency for re-establishing Civil Code art. 2323. I am now of the opinion that the function of establishing comparative negligence in Louisiana is solely a judicial function. In this civilian jurisdiction we do not follow decisional "law." Neither stare decisis nor jurisprudence constante, are in and of themselves loi in Louisiana. Jurisprudence may create custom and jurisprudence penned by an astute judge may become doctrine but jurisprudence can only supercede the Code when that jurisprudence has become entrenched as custom and the Code provision has fallen into complete desuetude.
Professor Ferdinand Stone[3] has long advocated that it was a judicial function to apply the clear language of Civil Code art. 2323. Professor Wex Malone[4] has also stated that this Supreme Court need merely recognize Article 2323 of the Civil Code to accomplish a restoration of Louisiana's civilian heritage of comparative negligence.
I now express my very strong personal opinion that the Louisiana Supreme Court has failed to comply with the law in regard to comparative negligence. Article 1 of the Civil Code says: "Law is a solemn [formal] expression of legislative will." Civil Code Article 13 states: "When a law is clear and free from all ambiguity, the letter of it is not to be disregarded, under the pretext of pursuing its spirit." Civil Code Article 18 provides:

*556 "The universal and most effectual way of discovering the true meaning of a law, when its expressions are dubious, is by considering the reason and spirit of it, or the cause which induced the Legislature to enact it."
It is only when there is no express law that the judge may decide according "to natural law and reason, or received usages * * *."
We in Louisiana have an express statement of the legislative will which is the law when one has received damage because of the fault of another but has himself also acted imprudently. The lawCivil Code art. 2323appears clear and free from ambiguity, but even if it were not, it nonetheless expresses the intent of the legislature, the determination and application of which is this Court's obligation. The legislature certainly never intended the foreign doctrine of contributory negligence.
To meet my own old argument that since the legislature has refused to act to restore comparative negligence, the Court should not so act, I now state my belief that failure of a legislature to act is not in and of itself an act of the legislature. Also, although I do not think it necessary, I could adopt the theory of my fellow justice of the Florida Supreme Court, that defeat of a legislative act, and failure of the legislature thereafter to move to adopt comparative negligence, is probably due to the legislature considering the problem to be a judicial one. It is not that our legislature has not spoken; it is not that our legislature has not enacted a comparative negligence doctrine; rather, it is that the legislature has placed on the books (in the Code) and left on the books a thoroughly explicit pronouncement that Louisiana is governed by comparative negligence. It would be a vain and useless act for the legislature to restate what it has already stated most adequately. Having thus stated the law they may rest and the blame for not finding and applying the law must be borne by the courts. The law is there Article 2323. This Court must discover it, must interpret it, and must apply it. Failure to do so constitutes a violation of the law as articulated by the legislature and amounts to shirking the responsibility which we have as judges.
For these reasons, I respectfully concur in awarding plaintiff damages. I am of the opinion that the appellate court on remand should weigh the negligence of the plaintiff and defendants and in light of Civil Code Article 2323 make the appropriate award to the plaintiff.
NOTES
[1] See, e. g., Williams v. State Farm Ins. Co., 273 So.2d 680 (La.App.1st Cir. 1973); Groom v. T. E. Mercer Trucking Co., 253 So.2d 586 (La.App.3d Cir. 1971); Barnes v. Toye Bros. Yellow Cab Co., 204 So.2d 83 (La.App.4th Cir. 1967).
[2] Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962).
[3] Vascoe v. State Farm Mutual Auto. Ins. Co., 260 So.2d 161 (La.App.2d Cir. 1972); Arnold v. Grain Dealers Mutual Insurance Co., 190 So.2d 261 (La.App.4th Cir. 1966).
[4] Layfield v. Altazan, 255 So.2d 363 (La.App. 1st Cir. 1971).
[1] The case is noted in 48 Tul.L.Rev. 746 (1974). See also Nga Li v. Yellow Cab Company of California, 13 Cal.3d 804, 119 Cal. Rptr. 858 (1975), which has jurisprudentially adopted comparative negligence after explicitly recognizing that their "civil code" provided for contributory negligence.
[2] Duval v. Thomas, 114 So.2d 791, 795 (Fla. 1959).
[3] See, e. g., Stone, Tort Doctrine in Louisiana: The Concept of Fault, 27 Tul.L. Rev. 1, 15-18 (1952).
[4] Malone, Comparative NegligenceLouisiana's Forgotten Heritage, VI La.L.Rev. 125 (1945-46).