340 So.2d 678 (1976)
William M. CARLTON, Jr.
v.
GREAT AMERICAN INSURANCE COMPANY et al.
No. 7718.
Court of Appeal of Louisiana, Fourth Circuit.
December 14, 1976.
Rehearing Denied January 12, 1977.
Writ Refused March 16, 1977.
*679 Cameron C. Gamble, New Orleans, for plaintiff-appellant.
Robert J. Young, Jr., Joseph R. McMahon, Jr., Edward L. Levert, Jr., E. Gordon Schaefer, Jr., Donald D. Hammett, New Orleans, for defendants-appellees.
Before GULOTTA, STOULIG and BEER, JJ.
BEER, Judge.
William M. Carlton, Jr. sought damages for injuries and medical expenses allegedly resulting from a rear-end collision which took place on November 11, 1969, and allegedly due to the negligence of William Harvey Moynan. Great American Insurance Company (hereafter, "Great American") and American Southern Insurance Company (hereafter, "American Southern") were sued as Moynan's liability insurers. Subsequently Carlton supplemented and amended his petition:
(1) to dismiss Great American as a party defendant and to add Canadian Universal Insurance Company (hereafter, "Canadian") and Continental National American Insurance Company (hereafter, "Continental") as defendants,
(2) to allege aggravation of a preexisting physical condition and precipitation of latent physical defects, and
(3) to allege traumatic neurosis in addition to the previously itemized damages resulting from the accident.
Answering, Moynan specifically pleaded a compromise agreement as extinguishment of any and all claims arising from the accident. Moynan also filed a third party action against his insurer, Great American, seeking indemnification in the event he was cast in judgment.
American Southern answered, alleging compromise and release. American Southern also filed a third party action against Great American seeking indemnification.
Canadian answered, alleging that its insurance was excess, available only in the event that the primary policy limits were exhausted. Canadian, also, pleads compromise and release. In a third party action, Canadian alleged that Great American was the primary insurer and sought indemnification if cast in any manner other than excess insurer.
Travelers Insurance Company, self-insured employer of Carlton, filed a petition of intervention, seeking to recover $2,804.77 in workmen's compensation payments and medical expenses.
American Southern, Canadian and Moynan amended their answers to further allege that an unknown female driver crowded from the left land of traffic into the right lane of traffic in which Moynan was traveling, causing him to be forced to the right side of the two-laned street, causing the collision. Thus, they contended that the accident was unavoidable.
*680 Prior to trial, the parties essentially agreed that primary coverage was afforded to Moynan by American Southern with primary limits of $5,000 and there was also in effect a policy of excess insurance written through Canadian with limits of $95,000. They also apparently agreed that Great American's coverage excluded "owned" automobiles and that, therefore, they should be dismissed and, finally, that Continental American should also be dismissed because their policy was not in effect on the date of the alleged accident.
However, by second supplemental and amended petition, Carlton reinstated his claim against Great American who was represented at the trial and included in the judgment.
Exceptions of res judicata were filed by the various defendants premised upon a compromise and release agreement of July 29, 1970. The exceptions were directed against Carlton's claim as well as Travelers' intervention. Carlton responded averring that error and misrepresentations invalidated the release. After a hearing on the exceptions, the trial court rendered judgments in favor of defendants Moynan, American Southern, Canadian and Great American, and against Carlton and Travelers. Motion for new trial was denied. Carlton appealed and this court reversed and remanded (see La.App., 273 So.2d 655). Since Travelers did not appeal, the judgment dismissing its intervention became final. This court held that the compromise and release agreement dated July 29, 1970, between Carlton, Moynan and American Southern, as related to the November 11, 1969 accident, was null, void and of no effect. Writs were refused by the Louisiana Supreme Court in view of the fact that the case had been remanded by this court to the trial court and no final judgment was involved.
Moynan died on July 8, 1972, and his widow, executrix and sole heir, Norah Vives Moynan, was made a defendant in his place.
A jury trial on the merits (March 5-6, 10-12 of 1975) resulted in a verdict in favor of the defendants, Great American, American Southern, Canadian, Continental National and Norah Vives Moynan, and against plaintiff Carlton, dismissing his suit. Carlton devolutively appeals, contending that the verdict is manifestly erroneous in that the defendant-appellees never overcame the presumption of negligence which attaches in rear-end collisions and, in fact, were judicially bound by Moynan's plea of guilty to the traffic citation issued at the time the accident was investigated. He further contends that the trial court manifestly erred in admitting into evidence the pleadings and record of a separate law suit instituted by him for damages caused by a subsequent accident and then compounded this error by disallowing Carlton's attempt to acquaint the jury with the details of that settlement.
Carlton testified that he was working as assistant manager of the engineering section of Travelers Insurance Company when the accident occurred. He described the accident as follows:
"Q. All right. Now, on November 11, 1969, at the time of the accident that is involved in this matter, where were you going?
A. To the Sewerage & Water Board pumping station in the four hundred block of North Broad.
Q. Now, can you tell us what happened at the time of the accident, describe the accident, sir?
A. Yes, sir.
Just before getting ready to make the turn, I looked in the rear view mirror, and there was nothing behind me, and I had given the signal that I was turning right, and all of a sudden I was struck from the rear.
Q. Do you know the name of the individual that struck you from the rear? A. Yes, sir, William Harvey Moynan."
Berno Scallan, the investigating police officer, spoke with both drivers following the accident. He testified:

*681 "A. Mr. Carlton, who was the driver of the first vehicle said that he was slowing down to turn into a drive, a driveway in the four hundred block of North Broad, and the driver of the other vehicle driven by Mr. Moynan struck his vehicle from the rear.
Q. Did Mr. Moynan explain how the accident happened?
A. Yes, sir, he stated as he was driving down the street, he was being crowded by another vehicle so he gave way a little bit, and didn't notice Mr. Carlton's vehicle, and ran into it."
In describing the damages, Officer Scallan testified:
"A. As reflected on my report, Mr. Carlton's vehicle was damaged to the left rear, light damage, Mr. Moynan's vehicle was damaged to the right front, light damage.
Q. Does it also indicate how the vehicle left the scene?
A. Both vehicles were driven off by the operator."
Carlton had, prior to the accident, experienced a long history of cervical and lumbar difficulties, but he contends that in November of 1969, his back and neck condition had stabilized and he had reached a desirable degree of comfortableness with respect to his prior disabling condition.
A review of this medical history indicates that in 1964, Carlton underwent a cervical disc operation necessitated by an industrial accident. In January, 1968, a new effort to fuse became necessary and the procedure was carried out. Again, in January, 1969, another fusion attempt was necessary. There were no further surgical procedures prior to the accident, and Carlton contends that he "felt good" during this interim period although a neck "collar" had been prescribed in October, 1969. After the accident, Carlton continued to work in November and December, but, thereafter, took vacation time off in lieu of sick leave because he "wasn't feeling well after the accident." In January, 1970, Mr. Carlton was seen at Mercy Hospital but tests were inconclusive and he was discharged on January 7. He returned to work but was again seen by Dr. Llewellyn on February 16, 1970, and, again, on March 9, 1970. Dr. Llewellyn placed Carlton in Methodist Hospital in April, 1970, and Dr. Richardson, in neurosurgical consultation with Dr. Llewellyn, performed a chordotomy operation on April 3, 1970. Carlton remained hospitalized for approximately four weeks following the operation. Subsequently, Carlton complained to Dr. Richardson of a severe burning sensation in the right leg, pain in the lower back, and difficulty in ambulation. However, the neck and arm pain decreased after the chordotomy and eventually subsided. Carlton returned to work in the latter part of June, 1970, and until December of 1970, his work record was, in his words, "one hundred percent." However, Carlton entered Ochsner Foundation Hospital in December, 1970, due to "deep burning" pains in his right leg and low back.
Carlton was involved in another rear-end collision on January 4, 1971. On January 8, 1971, Dr. Llewellyn "felt that the patient had experienced yet another aggravation of the old neck problem. . . ." He hospitalized Carlton at Methodist Hospital in mid-January, 1971, for bedrest, x-rays and examinations. Ten days later, he was discharged and returned to work. In May, 1971, Carlton was again hospitalized. He was then having difficulty walking. A lumbar laminectomy was performed and he was discharged about seven weeks later. In August, 1971, a foot drop brace was necessitated due to weakness in the right leg. Carlton returned to a "modified work schedule" in November, 1971. On April 12, 1972, plaintiff was rehospitalized in Methodist Hospital where another lumbar laminectomy was performed. Carlton returned to a "modified work schedule" in September, 1972. In November, 1972, Carlton went on "extended disability" with Travelers Insurance Company and has not worked since that time. Carlton then saw Dr. Haynie, a psychiatrist, between April 24, 1973 and March 12, 1974. He was hospitalized in *682 1973 and operated on by Dr. Ralph Sagrera because of the formation of bladder stones. In March, 1974, Dr. Llewellyn hospitalized him for a one month term for medication and tests and, thereafter, on August 6, 1974, Dr. Llewellyn again performed surgery in the lumbar area. After approximately one month in the hospital, Carlton was discharged but continued to be followed as an out patient by Dr. Llewellyn and Dr. Sagrera.
Dr. Llewellyn testified that he first treated Carlton in 1964 and at intervals up to the time of trial. Based upon his March, 1970 examination, he concluded that ". . . the patient had aggravated the preexisting chronic unresolved neck problem, his cervical disc problem. . . ." And the aggravated condition ". . . was a consequence of him (Mr. Carlton) experiencing an automobile accident on November 11, 1969." He acknowledges, however, that there was no evidence of fracture or dislocation of the cervical spine following the November 11, 1969 accident and further acknowledges that Carlton's low-back complaints were more likely related to the second automobile accident of January 4, 1971.
Dr. Jose L. Garcia Oller was first consulted by Carlton on October 3, 1969 (just prior to the November accident), and noted a history of three previous operations attempting to alleviate his neck problems. Carlton next saw Dr. Garcia Oller on December 15, 1969, following the November 11, 1969 accident. Dr. Garcia Oller testified that at the time of the December examination, he believed: ". . . as a result of this accident of November 11th that Mr. Carlton had suffered an injury to the ligaments of his neck and probably a stretching of the nerve structures of his neck and it was my opinion that he was likely, that after a period of several months, he would recover from the results of this accident."
Dr. Garcia Oller again examined plaintiff on January 5, 1970, and with respect thereto states:
". . . in summary he had no sign of nerve pressures in the region of his back and in as far as his arms and neck, the condition was essentially the same as when I had previously examined the patient two weeks before."
Dr. Garcia Oller's opinion was summarized as follows:
"Q. Doctor, in summation, having treated Mr. Carlton before, both before and after the November, 1969 accident, is it still your opinion that he received a cervical strain, a sprain type of injury in the accident and should have recovered within several months from the date of the accident?
A. Yes, sir, that's my opinion."
Dr. Donald E. Richardson, a neurosurgeon, testified that the chordotomy was necessary due to the "continuous pain in his (Mr. Carlton's) right arm."
Dr. H. G. Haynie, a psychiatrist, testified that he first consulted with Carlton on March 31, 1970, and on seven subsequent occasions between April 24, 1973 and March 12, 1974, at the recommendation of Dr. Llewellyn. He states:
"Well, Dr. Llewellyn was hopeful that I could help Mr. Carlton make somewhat better emotional adjustment to his pain, learn to live more freely, comfortable with his pain and he also hoped that I might be able to adjust the various medications to help him to be more either emotionally comfortable or of less pain through regulation of his pain medication directly."
He further observes:
"(M)y impression was that this man was carrying on rather well and continuing to work and that he was just growing rather weary and somewhat tired because of his chronic neck and arm pain and at that time that was part of the consideration of doing the neurological procedure for relief of the pain."
Prior to the January 4, 1971 accident, Carlton apparently indicated to Dr. Haynie that he was "coming along well" but after the second accident the pain was very severe. Dr. Haynie related this pain to the *683 January 4, 1971 accident (Tr. Vol. II at p. 122). Carlton felt that Dr. Haynie "has the dates mixed up." However, Dr. Haynie testified on cross examination: ". . . I don't know anything about a 1969 accident."
Dr. Sagrera was of the view that Carlton's bladder condition probably existed several years prior to his April, 1970 examination.
In the course of the trial, defendants' counsel questioned Carlton regarding the January 4, 1971 accident and the law suit emanating therefrom. Able counsel for all parties have stipulated that Carlton's counsel interposed an objection at this point in the proceedings which was overruled by the trial judge. On redirect, Carlton's counsel questioned him regarding the amount of the settlement of that claim. At this point in the proceedings, defense counsel requested that counsel for both parties be permitted to approach the bench. There was an off-the-record discussion. Immediately following that discussion, the record reflects only the following:
"THE COURT:
"All right, gentlemen, any further questions?
MR. GAMBLE:
Your Honor, I have no further questions."
Again, able counsel for all parties have stipulated that defendants' counsel interposed an objection to the admission of the information regarding the settlement which was sustained by the trial judge.
When the record is augmented by the stipulations noted above, the contentions of Carlton's counsel, with respect to the assignment of error regarding the trial court's rulings, are clarified.
Stated another way, the chronological sequence of events was as follows:
1. Counsel for the defendants sought to place before the jury the record that dealt with the second accident and the litigation resulting therefrom.
2. Carlton's counsel objected.
3. The court overruled the objection.
4. Carlton's counsel sought, by a question directed to Carlton, to demonstrate to the jury the amount that Carlton received in settlement of that litigation.
5. Defendants' counsel objected.
6. The court sustained the objection.
Although we are concerned about the correctness of these rulings when considered individually, our concern is substantially dissolved by the holding in Naquin v. Maryland Casualty Company, 311 So.2d 48 (La.App. 3rd Cir., 1975) writ ref., La., 313 So.2d 598, which states:
"When a review of the record indicates the trial court judgment is correct and that justice has been done, the judgment will not be overturned because of error which did not affect the merits. LSA-C. C.P. 2164; Shows v. Williamson, 256 So.2d 688 (La.App. 2 Cir. 1972). When error is detected, it must be weighed to determine whether such error is harmless or prejudicial. Lauro v. Travelers Insurance Company, 261 So.2d 261 (La.App. 4 Cir. 1972). When there is evidence before the trier of fact which, upon reasonable evaluation, furnishes a factual basis for the trial court's finding, the appellate court, on review, should not disturb this factual finding absent manifest error. Canter v. Koehring Company, 283 So.2d 716 (La.1973)."
This mandate has recently been fortified in Temple v. Liberty Mutual Ins. Co., 330 So.2d 891 (Sup.Ct., 1976):
"An appellate court, even if it believes that errors committed at trial influenced the jury's verdict, must undertake an independent evaluation of the facts and adjudicate the controversy before it. Gonzales, supra."
Turning to Carlton's other contention, we are of the view that even if defendants failed to overcome the presumption of negligence enunciated in LSA-R.S. 32:81 and Eubanks v. Brasseal, 310 So.2d 550 (La.Sup.Ct., 1975), the medical and lay testimony adduced at the trial could reasonably have been interpreted by the jury as *684 failing to establish the requisite causal link between an act of negligence on the part of Moynan and Carlton's alleged disabilities.
Stated another way, the record supports the reasonableness of a conclusion by the jury that Carlton's physical and/or mental problems were not related to the accident of November 11, 1969. Had interrogatories been propounded to the jury with respect to the various factual determinations which they were required to make, sorting out the jury's factual conclusions might have been simplified. However, we work with what we have, and, in this instance, we believe that the form of the jury verdict is a satisfactory and understandable expression of their views regarding this case.
The judgment of the Civil District Court for the Parish of Orleans is affirmed. All parties to this appeal shall bear their own costs.
AFFIRMED.