540 So.2d 977 (1989)
Lamar WEBB and Inell White Webb, Plaintiffs/Appellants,
v.
Johnnie L. JORDAN, et al., Defendants/Appellees.
No. 20300-CA.
Court of Appeal of Louisiana, Second Circuit.
February 22, 1989.
*978 D. Scott Brown, Mansfield, for plaintiffs/appellants.
Mayer, Smith and Roberts by Mark A. Goodwin, Shreveport, for defendants/appellees.
Before HALL, FRED W. JONES, Jr. and NORRIS, JJ.
HALL, Chief Judge.
Plaintiffs, Lamar Webb and Inell White Webb, filed suit against defendants, Johnnie L. Jordan, and his liability insurer, Fireman's Fund Insurance Company, for damages resulting from a rear-end collision on U.S. Highway 171 in DeSoto Parish. After a trial on the merits the trial court rendered judgment in favor of defendants finding that (1) the sole cause of the accident was the negligence of Inell White Webb; and (2) Johnnie L. Jordan was free from fault. Plaintiffs appealed contending that the trial court erred in making these findings and in failing to award damages. For the reasons which follow, we conclude that Jordan was comparatively negligent and reverse and render judgment awarding damages to plaintiffs.
On December 1, 1984, at approximately 6:22 p.m., Inell White Webb was travelling alone southbound on U.S. Highway 171, 4.4 miles south of Mansfield. The highway has a single lane for travel in each direction and a paved shoulder on each side of the roadway at this point. Webb stopped her vehicle and yielded the right-of-way to northbound traffic prior to turning left off of the highway onto the property known as Trenton Pond. Defendant, accompanied by his grandson, Gregory Jordan, was travelling south on Highway 171 with his cruise control set on 55 m.p.h. when he proceeded around a curve, came over a hill, and saw the Webb vehicle. Jordan applied his brakes and skidded 70 feet prior to hitting Webb. The force from Jordan's vehicle knocked the Webb vehicle 45 feet across the northbound traffic lane between two oncoming vehicles. Webb was taken to DeSoto General Hospital for treatment.
After a trial on the merits, the court found that Webb did not give any turn signals, and her negligence was the sole cause of the collision. The court found Jordan free from fault since he was travelling at a lawful rate of speed, and under *979 the circumstances he could not avoid colliding with the rear of the Webb vehicle.
WEBB'S NEGLIGENCE
Every vehicle upon a highway within this state at any time between sunset and sunrise and at any other time when, due to insufficient light or unfavorable atmospheric conditions, persons and vehicles on the highway are not clearly discernable at a distance of 500 feet ahead, shall display lighted lamps. LSA-R.S. 32:301. No person shall operate on the highways of this state any motor vehicle registered in this state and manufactured or assembled after December 31, 1962, unless it is equipped with at least two stop lamps meeting the requirements of LSA-R.S. 32:319. LSA-R.S. 32:306 A. Whenever a person intends to make a right or left turn which will take his vehicle from the highway it is then travelling, he shall give a signal of such intention and such signal shall be given continuously during not less than the last one hundred feet travelled by the vehicle before turning. LSA-R.S. 32:104.
Driving a motor vehicle on the highway without properly illuminated signals creates an unreasonable risk of injury to a following motorist as well as to the driver of a leading vehicle, and a leading motorist has a duty to have the proper lights illuminated. The scope of this duty encompasses the risk that a following motorist will not be keeping a proper lookout and may fail to see what he should have seen causing injuries to both himself and the other driver. It necessarily follows that if Webb failed to give proper signals her initial negligence was the precipitating cause of the accident.
Plaintiffs contend that the trial court erred in finding that (1) Webb did not give any turn signals; and (2) no lights were illuminated on the rear of the Webb vehicle.
Inell White Webb testified that she was going fishing at Trenton Pond when the accident occurred. She had her lights on, turned her left turn signal on, and stopped in the southbound lane of travel while she yielded the right-of-way to northbound traffic. Jordan's vehicle struck the rear of her vehicle and propelled her between two oncoming northbound vehicles. Webb and her husband inspected the vehicle before she went fishing. All of the lights were in working order. She stated that they always inspected the vehicle prior to use. A police officer arrived at the accident scene in approximately 10 minutes. Her husband did not turn the vehicle's lights off until a police officer authorized him to do so.
Lamar Webb, Inell White Webb's husband, testified that the lights were in working order on the date of the accident. He stated that it was his custom to always check the vehicle prior to its use. Although he inspected the vehicle he did not know whether his wife had her lights on when she left the house to go fishing. The signal light was blinking when he arrived at the scene of the accident. He unscrewed the bulb because someone told him that a picture of the vehicle could not be taken with the light blinking. He did not know who told him to stop the light from blinking.
Erlene Richardson, a friend of plaintiffs, was fishing at Trenton Pond when the accident occurred. She heard the crash and ran up the hill to see what happened. She saw the Webb vehicle with its lights on. She heard Jordan say that Webb's signal was not on. She told Jordan that Webb's signal lamp and headlights were on but someone had cut them off. The lights were on when the policeman arrived at the scene. She stated that since the rear taillight was blinking someone unscrewed the bulb to stop it.
Johnnie L. Jordan, who was 67 years old on the date of the accident, testified. He stated that the accident occurred when it was getting dusk dark and visibility was at its worst point. He was sure that he had his lights on but did not remember specifically. Prior to hitting Webb's vehicle he saw several cars in the northbound traffic lane, and he could not go around her on the left. High grass and a sign on the right shoulder prevented him from going around the Webb vehicle on the right. He did not see any lights on the Webb vehicle. He did not remember any person, other than *980 Webb, state that Webb had her lights on. He was driving with his cruise control set on 55 m.p.h. when he came around a little curve and saw the bulk of Webb's vehicle. He noticed that Webb's vehicle was stopped and braked hard.
Gregory D. Jordan, Jordan's 14 year old grandson, was a passenger in Jordan's vehicle. He and his grandfather were riding along and not talking when the accident occurred. As they were going around the curve and getting closer to the bottom of the hill he saw the car and yelled "Pap-Paw". His grandfather applied the brakes. He did not remember seeing any lights on Webb's vehicle but was not absolutely certain.
At approximately 7:15 p.m., Detective R.D. Dobson of the Louisiana State Police investigated the accident and took photographs of the scene. Jordan's vehicle left a skid mark of 70 feet. The wheels on Webb's vehicle were turned to the left, and it travelled approximately 45 feet after impact. He was unable to determine whether the rear lights on Webb's vehicle were operational due to the damages. The headlights on the Webb vehicle were turned off when he arrived. Webb told him that her signal lights were on when the accident occurred. The accident scene was described as a long straight downhill section with nothing to impede Jordan from making a stop after seeing a vehicle turning left at Trenton Pond.
The trial court was not clearly wrong when it determined that Webb did not give any turn signals. The court also did not err when it implicitly found that no lights were illuminated on the rear of Webb's vehicle. Jordan stated that he did not see any lights illuminated on Webb's vehicle. Gregory Jordan, while not absolutely certain, did not see any lights illuminated. Although plaintiffs testified that they inspected the vehicle prior to each use, the court was entitled to reject their testimony. Furthermore, the officer who took the photographs testified that the lights were off when he arrived, and he could not determine if they were in working order. The officer's testimony directly contradicted Lamar Webb's testimony since Webb stated that the lights were blinking when the person taking the pictures arrived. The trial court's findings were primarily credibility calls and will not be disturbed on appeal.
JORDAN'S NEGLIGENCE
A motorist has a duty to maintain a lookout ahead and observe any obstructions present and exercise care to avoid them. When a following vehicle collides with a preceding vehicle, the following motorist is presumed to be negligent. When this presumption is applied, it effectively shifts the burden of proof to the driver of the following vehicle to prove that he was not negligent. Eubanks v. Brasseal, 310 So.2d 550 (La.1975); Dickerson v. Jordan, 514 So.2d 719 (La.App. 2d Cir.1987); Prest v. State Department of Transportation, 490 So.2d 659 (La.App. 2d Cir.1986), writ denied 494 So.2d 328 (La.1986); McAllister v. Ruffin, 451 So.2d 686 (La.App. 2d Cir. 1984). To exculpate himself, the following motorist who collides with a preceding vehicle must show that he kept his vehicle under control, that he closely observed the forward vehicle, that he followed at a safe distance under the circumstances, or that the driver of the lead vehicle negligently created a hazard which the following vehicle could not reasonably avoid. State Farm Mutual Automobile Insurance Co. v. Hoerner, 426 So.2d 205 (La.App. 4th Cir.1982), writ denied 433 So.2d 154 (La. 1983).
It was defendants' burden to prove that Jordan was keeping a proper lookout and because of the topography of the road and poor lighting conditions, he could not have seen the stopped Webb vehicle in time to avoid the accident. Defendants failed to carry their burden of proof.
Defendants did not prove that Jordan's view of the stopped vehicle was obstructed by the curve, the hill, and the darkened lighting conditions to the extent that Jordan could not, by keeping a proper lookout, have observed the vehicle until he was so close to it that he did not have time to avoid the accident.
Detective Dobson described the terrain of the road from the north approaching *981 Trenton Pond as "a long straight downhill". He did not notice anything that impeded Jordan's vision or prevented him from making a stop after seeing a vehicle turning left at Trenton Pond.
Jordan had his cruise control set on 55 m.p.h., and he stated that it was dusk dark with visibility at its worst point. As he rounded the curve he saw the Webb vehicle. He described the entrance to the pond as "not quite all the way to the bottom of the valley of the hill" and as "one-third or one-fourth" down the hill.
Gregory Jordan initially stated that the Webb vehicle was at the bottom of the hill. He later described the accident site as one-third down the slope. He stated that as they were going around the curve and getting closer to the bottom of the hill he saw the Webb vehicle.
Defendants offered no evidence to show at what distance from the point of impact a driver travelling south, keeping a proper lookout, could first see the stopped Webb vehicle. Defendants failed to prove that Jordan could not have seen the vehicle in time to avoid the accident, had he been keeping a proper lookout and exercising a reasonable degree of caution. Defendants did not establish that Jordan was unable to avoid the accident either by bringing his vehicle to a stop or by going around the Webb vehicle on the shoulder to the right. Although Jordan stated that a sign and high grass on the shoulder prevented him from going to the right, the photographs in evidence illustrate that there is a wide smooth shoulder on which he could have travelled around the Webb vehicle.
Defendants failed to overcome the presumption of Jordan's negligence, and the trial court was clearly wrong in finding Jordan free from fault.
Comparing the respective fault of the parties we note that the initial negligence of Webb was the precipitating cause of the accident. We attribute 60% fault to Webb and 40% fault to Jordan.
DAMAGES
On December 1, 1984, shortly after the accident, Webb was examined by Dr. Turkeurst. The examination revealed tenderness at C-2, C-7, and along the trapezius muscles. X-rays revealed no fracture or malalignment. The examination further revealed that Webb had chronic arthritic changes at C-5 and C-6. He did not hospitalize Webb and allowed her to return home.
On December 3, 1984, Dr. Jeffrey L. Evans examined Webb and found her reflexes intact with no motor or sensory deficits. He diagnosed her as having an acute cervical strain with chronic degenerative joint disease at C-5 and C-6. He prescribed muscle relaxants and pain medication for her symptoms. On December 10, 1984, Webb complained of ringing in her ears. Dr. Evans examined her and felt that her problem was caused by high blood pressure. On January 7, 1985, Dr. Evans examined Webb again. Her chief complaints were severe headaches and pain in the upper and lower back. He gave her medication for muscle spasms and inflammation. He referred her to a chiropractor for further therapy.
On January 8, 1985, Dr. Kevin M. Kelly, chiropractor, examined Webb. He found that her cervical range of motion was limited. Webb had tenderness from C-3 through C-7. He diagnosed Webb as having chronic traumatic cervico-brachial syndrome, complicated by cervical, thoraic, and lumbar strains and sprains. Her prognosis was poor at that time. He recommended that she stay off from work 22 weeks since he felt that operating a pressing machine at a cleaners would aggravate her injuries. In May of 1985, Webb improved and returned to work as a shirt presser at the cleaners. On July 10, 1985, Webb's condition was improved and stabilized but she had not reached maximum improvement. Webb had a disc protrusion at C-5, C-6, and C-7 which in Dr. Kelly's opinion was consistent with her problems associated with the rear-end collision. Dr. Kelly treated Webb 20 times. He released her from his care in August of 1985 after she reached maximum chiropractic improvement.
*982 In October of 1985, Webb was involved in another automobile accident. Dr. Kelly treated Webb's injuries which involved the same areas injured on December 1, 1984. He felt that Webb's injuries from the first accident might have been permanent but could not say for certain since she had the second accident. In his opinion, the first accident hampered Webb's recovery from the second accident. Dr. Kelly last treated Webb on January 23, 1987, and Webb had not reached maximum chiropractic improvement. In his opinion all chiropractic bills and expenses incurred after the second accident were related to the second accident.
On February 3, 1986, Dr. Don Joffrion, board certified in orthopedic medicine, examined Webb. Webb complained of soreness in the neck and lower back region. She also complained of frequent urination. He found a full range of motion in the cervical spine area. There was no evidence of pain, spasms, pinching of nerves, mechanical blocks, or arthritis. She had tenderness in the lumbar area but her range of motion was normal. He felt that Webb's complaint of pain in the lumbar area was inconsistent. Webb's complaint of pain was also inconsistent when he tested her for sciatica. Webb had no clinical findings of ongoing cervical lumbosacral strain. All other tests were normal.
Douglas McLauren, Webb's employer, stated that he bought Brown's Laundry and Dry Cleaners in April 1985. Webb visited the cleaners during McLauren's first week as owner. Webb was concerned about her future employment with him as the new owner. Webb worked as a presser for three days in April but was unable to continue. She returned to work in May 1985 and subsequently became a supervisor. McLauren noticed a tightening in Webb's back and neck muscles when she experienced pain at work.
At trial Webb stated that she was still experiencing pain associated with the accident. She wears a heat collar and takes medication. Sometimes she has difficulty dressing herself. She had improved prior to the accident in October 1985. She has worked fulltime as a supervisor at the cleaners since the second accident. She occasionally has to go to the doctor during working hours.
Webb is entitled to 22 weeks of lost wages less a credit for the three days that she worked in April 1985. She is also entitled to medical expenses through August 1985, prior to the October accident. Webb did not prove a chronic debilitating disease or injury resulting from the first accident continued beyond her discharge by the chiropractor. By August of 1985 Webb reached maximum chiropractic improvement and was released. Any damages attributable to the first accident after the second accident are speculative. Dr. Joffrion did not find any evidence of pain, spasms, pinching of nerves, mechanical blocks, or arthritis in February 1986.
Inell White Webb, individually, is entitled to $5,000 in general damages, and Inell White Webb and Lamar Webb are entitled to $2,407.50 in past lost wages and $2,319.36 for past medical expenses, less 60% attributable to Inell White Webb's fault.
DECREE
Accordingly, the judgment of the trial court is reversed. Judgment is rendered in favor of Inell White Webb and against Johnnie L. Jordan and Fireman's Fund Insurance Company in solido for $2,000, and in favor of Inell White Webb and Lamar Webb against Johnnie L. Jordan and Fireman's Fund Insurance Company in solido for $1,890.74, with legal interest on said amounts from date of judicial demand until paid.
Defendants are cast for all costs including expert witness fees of $150 and the costs of appeal.
REVERSED AND RENDERED.