LEWIS S. DOHERTY, III, Judge Pro Tem.*
This case arises from a rear-end collision that occurred on Louisiana Highway 24 in Lafourche Parish at approximately 12:20 in the afternoon on June 25, 1985.
Tina Isbell Bellas (plaintiff) was a passenger in a 1982 Dodge Aries owned and being driven by her mother, Marie Bellas,[1] which was rear-ended by an eighteen-wheel tanker truck owned by Dresser Industries, Inc., insured by Commercial Insurance Company, and driven by John W. Trosclair, Jr. (defendants).
Upon the conclusion of the trial of the matter, the trial court entered judgment in favor of defendants, issuing written findings of fact and conclusions of law which, essentially, absolve defendants of all liability based on the doctrine of “sudden emergency.” See e.g., Malone v. Hartford Ins. *1306 Co., 239 So.2d 697, 699 (La.App. 1st Cir.1970) (citing, inter alia, Taylor v. Genuine Parts Co., 192 So.2d 241 (La.App. 4th Cir.1966) writ denied 250 La. 23, 193 So.2d 530 (1967)).
FACTS
Both vehicles were travelling westerly towards Houma on Highway 24. Trosclair had delivered a load of cargo and was returning, unloaded, to the yard. Trosclair drove Highway 24 frequently; Marie Bel-las, a resident of the New Orleans area, was unfamiliar with the two-lane roadway. Bellas had noticed, some time before the accident, that defendant’s tanker truck was behind her.
As the two vehicles entered a slight bend[2] in the roadway they were confronted with an eighteen-wheel tractor trailer, engaged in passing, occupying their lane of travel. Bellas testified that she slowed her vehicle and steered it off the roadway. Trosclair testified that he saw the oncoming eighteen-wheeler, then saw plaintiff move onto the shoulder and then slammed on his brakes. State Trooper Louis Bo-quet, who arrived shortly after the accident, testified that Trosclair’s tanker left skid marks varying among the tires between 195 and 240 feet. Plaintiff’s vehicle left no skid marks. Trooper Boquet testified that plaintiff’s vehicle after impact was positioned approximately 250 feet[3] beyond the tanker, completely off the roadway; the tanker was partially off the roadway. Boquet also testified that the skid marks suggested the collision occurred on the highway, although both Bellas and Trosclair testified it occurred on the shoulder. The trial court determined that both vehicles were travelling between 40 to 45 miles per hour, and that Trosclair was maintaining at least a three car-length distance behind Bellas. Trosclair actually testified, however, that it was “maybe the distance of 2 or 3 car lengths.” Trosclair testified essentially that once he “locked-up” his brakes, he could not steer the tanker and that the light, unloaded tanker, once on the shell shoulder, began to slide. Tros-clair, in direct response to questioning, asserted that he nevertheless maintained complete control of the vehicle. The trial court determined that the tanker, skidding on the shell shoulder, was “significantly reduced” in its maneuverability, but nevertheless found that Trosclair maintained “full control” of the vehicle. The trial court also concluded that the two or three car-length distance between the tanker and plaintiff’s vehicle “was sufficient to bring the Dresser vehicle to a complete and safe stop under normal conditions that could have been reasonably anticipated....” and that “[although Trosclair’s conduct was a cause , in fact of the accident, his conduct was not substandard.”
LAW
An analysis of the facts in relation to the respective duties imposed on the actors is the method of determining fault under LSA-C.C. art. 2315. The first step in this four-tiered analysis involves determining cause-in-fact. See Mart v. Hill, 505 So.2d 1120, 1122 (La.1987). Without difficulty we can say that the driver of the vehicle in which plaintiff was a passenger did not negligently create an unavoidable hazard. We also agree with the trial court that Trosclair’s conduct was a cause-in-fact of the accident. The second step entails a determination of the respective duties of the actors. Id. At this juncture we must observe, as did the trial court, that the unknown driver of the eighteen-wheeler which forced both vehicles to take evasive action was most certainly an actor capable of being allocated with fault in this matter. See Veal v. Forrest, 543 So.2d 1121, 1123 (La.App. 1st Cir.1989). In this instance we note that the accident occurred prior to the 1987 amendment of LSA-C.C. art. 2324 limiting recovery against a joint tortfeasor to fifty percent of the damages. Accordingly, at the time of the accident, damages under the comparative negligence doctrine could be allocated only between a plaintiff and defendant when the plaintiff was contribu- *1307 torily negligent. Thus, in this instance, where the plaintiff is not only a passenger but is also free of fault there can be no apportionment of fault to her. Jones v. Progressive American Insurance Company, 505 So.2d 156 (La.App. 4th Cir.1987). 1987 La.Acts, No. 373 § 1. See Morrison v. J.A. Jones Construction Co., 587 So.2d 360, 365 (La.App. 4th Cir.1988); Jones v. Gateway Realty, Inc., 550 So.2d 388, 395 (La.App. 3d Cir.1989) writs denied 556 So.2d 27, 30 (1990).
Trosclair, as a following motorist, owed a high degree of care, statutorily imposed, to maintain a “reasonable and prudent” distance behind plaintiff’s vehicle. LSA-R.S. 32:81(A). The duty imposed by this statute is significant, so much so that a breach of this duty is presumed when a rear-end collision occurs. Veal, 543 So.2d at 1123 (citing Eubanks v. Brasseal, 310 So.2d 550 (La.1975)). The burden of rebutting this presumption may be borne by a showing that the following motorist maintained control, closely observed the lead vehicle, followed at a safe distance under the circumstances, or that the lead vehicle negligently created an unavoidable hazard. Id.[4]
The question thus becomes whether defendant has proved by a preponderance that he maintained control, closely observed plaintiff’s vehicle, and kept a safe distance. It should be noted that a following motorist may not rely on the assumption that other motorists will- operate their vehicles free of negligence when in fact the following driver observes some other motorist proceeding in a negligent manner. Malone v. Hartford Ins. Co., 239 So.2d 697, 700 (La.App. 1st Cir.1970). In this regard, we are persuaded by Trosclair’s own testimony that he saw the tanker and then saw plaintiff’s automobile take evasive action, and only then “locked up” his brakes. Moreover, we must disagree with the trial court’s conclusion that Tros-clair maintained control; his testimony reveals that upon this initial and continued application of his brakes, he was completely without control, sliding on the shell shoulder. Plaintiff’s vehicle, in comparison, slowed, without leaving skid marks, to between 10 and 15 miles per hour. Additionally we must conclude that a two or three car-length distance at 40 to 45 m.p.h. was shown insufficient by virtue of the occurrence of this accident. See Surplus Underwriters, Inc. v. Marocco, 242 So.2d 344, 345 (La.App. 4th Cir.1970) (in which “[djefendant admitted that he had seen the first of the three cars slowing to make a left turn, yet he was unable to stop without striking the second (plaintiff’s) car.”). Trosclair saw the oncoming vehicle prior to the lead vehicle’s evasive action. Bellas did not have a significantly longer amount of time to react, yet she was able to take evasive action without “locking up” her brakes or skidding. The only reasonable inference to be drawn is that Trosclair was following either too close or failed to observe the road ahead, or both. While this court is impressed with the specificity and quality of the trial judge’s findings of fact, nevertheless, he should have been mindful of the Louisiana Supreme Court’s decision in Mart v. Hill, in which it found a presumption of fault on the part of the driver of the following vehicle under remarkably similar circumstances. His failure to recognize this presumption constituted error and therefore his decision was clearly wrong.
DAMAGES
The impact from the tanker truck broke the front seat of plaintiff’s vehicle. Plaintiff was thrown forward and then backwards, and afterwards experienced a tingling sensation emanating from her neck down her back. An ambulance transported plaintiff to a Houma hospital emergency room where she was x-rayed and given *1308 medication for pain. The following morning plaintiff awoke experiencing sharp pains in both legs. She consulted Dr. Christopher Cenac that day.
Cenac’s initial examination revealed diminished “lordosis”[5] consistent with the presence of muscle spasm. Approximately a month after the accident plaintiff was admitted by Cenac into Terrebonne General Hospital for cervical and lumbar traction, physical therapy and diagnostic testing. A CAT scan revealed 3, 5 and 7 millimeter protrusions at C5-6 C4-5, and L3-4, respectively. Cenac diagnosed protruding discs at C5-6 and L4-5. Plaintiff also consulted Dr. Graffagnino, a urologist, who conducted several tests and diagnosed urinary dysfunction resulting from a combination of pain and the medication plaintiff was required to take. Graffagnino testified that such dysfunction was not uncommon in patients with spinal cord injuries and believed that the condition would likely resolve itself. Plaintiff was discharged from the hospital August 2, 1985.
Cenac saw plaintiff five more times, through October 16, 1985. On that last visit Cenac noted that plaintiff was experiencing “significant emotional difficulty” with respect to her injuries. Her October 30, 1985 appointment was not kept. She moved at some point during the fall of 1985 to New Orleans to live with her parents, and consulted her former orthopedist, Dr. Gessner, with regard to a pre-existing knee injury. Plaintiff then decided to obtain a second opinion from Gessner as to her back injuries.
Gessner hospitalized plaintiff at Monte-lepre Memorial Hospital on January 3, 1986. Gessner had a myelogram performed which indicated a “compromise in the ligament that covers the disc.” Gess-ner testified this finding was consistent with plaintiffs complaints of pain. Gess-ner performed a laminectomy which revealed a bulging disc at L4-5, which he removed. Gessner testified plaintiff’s results were good. With respect to plaintiffs neck injury, Gessner observed some unusual degenerative changes in the cervical spine which he thought were secondary to muscular injuries. He testified that plaintiffs complaints of headaches were consistent with this type of injury. Gess-ner’s prognosis is that plaintiff is predisposed now to additional injuries and is limited in her activities. Residual pain will be exacerbated by increased activity. Plaintiff lost 42 lbs. as prescribed which has helped her recovery. He does not believe she will require additional surgery.
Gessner referred plaintiff to Dr. Correa, a neurologist, who reviewed previous tests and admitted plaintiff to St. Jude Medical Center for additional tests. Correa’s initial examination revealed some muscular irregularities in the cervical region. Correa’s diagnosis following discharge from St. Jude was “chronic cervical sprain and cervical disc syndrome.”[6] Correa’s final prognosis is that plaintiff’s condition will probably resolve itself between one to two years, although she may suffer from occasional “flare-ups.”
We note that there is some testimony in the record from plaintiff’s treating physicians that her emotional involvement with her injuries has thwarted her full recovery. She was referred by Dr. Correa to a psychiatrist, Dr. Elodie Pons Braud, who conducted one brief interview. Plaintiff was apparently uncooperative with Dr. Braud because she had not been forewarned of the referral. Braud diagnosed “adult adjustment disorder with depressed mood,” meaning simply that plaintiff was experiencing difficulties adjusting to a major traumatic event, i.e., her injuries. Braud suggested that plaintiff seek further psychiatric attention. At the time of trial, plaintiff was undergoing psychiatric consultation approximately every two weeks with Dr. David J. Mitchell. Dr. Mitchell *1309 also diagnosed depression, prescribed antidepressant medication, and opined that his treatment would probably take six months. He testified that much of plaintiff’s depression stems from her dependence upon her parents and her inability to support herself and her two small children. Both plaintiff and her mother testified that plaintiff is unable to engage in any strenuous activities with her children or in any household chores. Considering the nature of the injuries sustained by plaintiff, their duration and expected future period of recovery, the Court finds that adequate compensation for her general damages is $100,000.00.
We note that plaintiff was not employed at the time of this accident. Plaintiff injured her knee on the job in September of 1984 and received worker’s compensation benefits until April of 1985. Gess-ner performed arthroscopic surgery on her knee and testified that he discharged her without limitations. This accident occurred in June of 1985. Plaintiff testified she had been seeking employment after April of 1985. She has not been employed since September of 1984. While the courts may recognize the plaintiff’s entitlement to future loss of earnings, even with a background of sporadic work history,[7] the testimony of the plaintiff is inconsistent with respect to her previous earnings and is unsupported by any documentary evidence. Therefore, we find that the plaintiff has failed to carry her burden of proof in this aspect of her demands.
For reasons expressed more fully herein-above, we must find that the trial court’s conclusions of law are not supported by the findings of fact, and we reverse specifically the finding that Trosclair was in control of his vehicle, as it is manifestly wrong in light of the record and Trosclair’s own testimony. We find defendants liable in solido with the unknown driver of the eighteen wheeler. Special damages are assessed at $48,245.25. General damages are assessed at $100,000.00. Costs are taxed to defendants.
REVERSED AND RENDERED.

 Judge Lewis S. Doherty, III, retired, is serving as judge pro tem by special appointment of the Louisiana Supreme Court to fill the vacancy created by the temporary appointment of Judge Melvin A. Shortess to the Supreme Court.

. Plaintiff’s mother, Marie Bellas, apparently settled her claim for injuries arising out of the accident.

. The trial court expressly found the curve did not contribute to the accident. We agree.

. Trosclair testified the impact propelled plaintiffs vehicle only 10 to 12 feet. We find Bo-quet’s testimony more persuasive.

. We note that some case law suggests the sudden emergency defense is available only to a vehicle completely free of fault. See e.g. McMullan v. Allstate, 242 So.2d 921 (La.App. 1st Cir.1970), writ denied 257 La. 990, 244 So.2d 859 (1971). The continued validity of this rigid pre-comparative fault doctrine is questionable; we believe an approach more consistent with comparative fault and the duty-risk analysis would be to consider the totality of circumstances and apportion fault as mandated by LSA-C.C. art. 2323.

. Lordosis is a medical term for the anterior concavity in the curvature of the lumbar and cervical spine as viewed from the side. See Dorlands’ Ilustrated Medical Dictionary 889 (25th ed. 1974).

. Correa describes “cervical disc syndrome" as a condition manifesting symptoms similar to a cervical disc herniation or rupture without actual disc pathology.

. Guillory v. Avondale Shipyards, Inc., 448 So.2d 1281 (La.1984); Landry v. Melancon, 558 So.2d 1143 (La.App. 1st Cir.1989).