484 So.2d 196 (1986)
Carol Jeanne ANDERSON
v.
Archie M. RABB, III, et al.
No. CA/84/1382.
Court of Appeal of Louisiana, First Circuit.
February 25, 1986.
Rehearing Denied March 31, 1986.
Writ Denied June 6, 1986.
*198 Otha Nelson, Jr., Baton Rouge, for plaintiff-appellant Carol Jeanne Anderson.
John White, Jr., Baton Rouge, for defendant-appellee Lois W. Jones, Archie M. Rabb, III, Maryland Cas. Co.
Taylor Caffery, Baton Rouge, for intervenor-appellee, State of La., thru the Dept. of Health & Human Resources.
Before GROVER L. COVINGTON, C.J., and WATKINS and SHORTESS, JJ.
GROVER L. COVINGTON, Chief Judge.
This is an action for damages arising out of an automobile accident involving vehicles driven by plaintiff-appellant, Carol Jeanne Anderson, and defendant-appellee, Archie M. Rabb, III. Rabb was insured under a liability policy issued by Maryland Casualty Company, providing $10,000 limits of liability.
The civil jury found, as follows:
(1) Plaintiff Anderson and defendant Rabb were each guilty of 50% fault causing plaintiff's damages.
(2) Plaintiff's damages, without reduction for plaintiff's own sub-standard conduct, totalled $15,000.
The parties stipulated that intervenor State of Louisiana through the Department of Health and Human Resources was entitled to recover $350.00.
The trial judge signed judgment in favor of plaintiff Anderson against defendants, Rabb and Maryland Casualty Company, in solido, for $7,500 plus legal interest from the date of judicial demand until paid, and all costs, and recognized the stipulated intervention.
Plaintiff appealed devolutively. On appeal, plaintiff assigns six errors.

ASSIGNMENT OF ERROR 1
This assignment specifies that the trial judge erred when he failed to grant plaintiff's request for an instanter subpoena to William E. Jones, who was the stepfather of defendant Rabb, to testify as a rebuttal witness for plaintiff-appellant.
Before testimony was taken, defendants moved the court to order a sequestration of the witnesses. The court did not require Rabb's stepfather to leave the courtroom. Plaintiff's counsel then moved for an instanter subpoena to Jones, stating: "I possibly will have to call him as a rebuttal witness so I'd like to have him placed under the rule of sequestration." Plaintiff's counsel acknowledged that plaintiff did not list Jones on the pretrial order as plaintiff's witness.
*199 The trial judge denied plaintiff's motion for an instanter subpoena to William E. Jones, remarking:
"The reason I'm doing this, it's a technique used by a lot of attorneys to get people out of the courtroom, they will do that and they have no intention of calling the witness."
A trial court has much discretion:
(1) in determining whether to modify a pretrial order listing witnesses. La.C.C.P. art. 1551; Sibley v. Menard, 398 So.2d 590 (La.App. 1st Cir.1980), writ denied 400 So.2d 211 (La.1981).
(2) in exempting a witness from its sequestration order. La.C.C.P. art. 1631; Sullivan v. Welch, 328 So.2d 731 (La.App. 3rd Cir.1976); and
(3) in determining the order of trial and in allowing rebuttal evidence. La.C.C.P. arts. 1631, 1632; Lea v. Baumann Surgical Supplies, Inc., 321 So.2d 844 (La.App. 1st Cir.1975), writ denied 325 So.2d 279 (La.1976).
The only reason given by plaintiff's counsel to support his motion for an instanter subpoena was that he might "possibly" want to call him as a rebuttal witness. Plaintiff-appellant has demonstrated no abuse of discretion in the trial court's ruling denying plaintiff's motion for an instanter subpoena to William E. Jones.
We find no merit in this assignment of error.

ASSIGNMENT OF ERROR 2
This assignment specifies that the trial judge erred in failing to allow plaintiff-appellant to offer into evidence "a copy of the lawsuit filed against her by Dr. J. Sidney Dann" as a means of showing the mental anguish she suffered as a result of the accident.
At trial, plaintiff's counsel questioned plaintiff as follows:
"Q. Ms. Anderson, did you receive a lawsuit from any of the doctors that treated you?"
Defendants' counsel objected to the relevancy of this question. Plaintiff's counsel argued that he would like to offer a copy of the judgment which had been obtained by Dr. Dann for the purpose of showing that plaintiff had been through a lawsuit as a result of this accident "which would possibly serve as a basis of showing that she is entitled to something for her mental anguish". The court ruled such evidence inadmissible.
Dr. Dann's bill to the plaintiff for $2,965 was admitted in evidence without objection by defendants.
For evidence to be relevant, it must have some probative value and be reasonably connected to the transaction in question. Vignes-Bombet Co., Inc. v. Rowe, 288 So.2d 889 (La.App. 1st Cir.1973).
Whether evidence is relevant is within discretion of the trial judge and his ruling will not be disturbed on appeal in the absence of a clear abuse of this discretion. Ketcher v. Illinois Central Gulf Railroad Company, 440 So.2d 805 (La.App. 1st Cir. 1983), writs denied 444 So.2d 1220, 1222. (La.1984).
Neither plaintiff's petition, her statement of claim in the pretrial order, nor her list of exhibits in the pretrial order makes any reference to a lawsuit filed by Dr. Dann against the plaintiff, as causing plaintiff any mental anguish.
Plaintiff-appellant has demonstrated no abuse of discretion in the trial court's ruling that evidence of Dr. Dann's suit and judgment against plaintiff was inadmissible as irrelevant.

ASSIGNMENT OF ERROR 3
Assignment of error 3 specifies that the trial judge erred when he failed to require Lois W. Jones to appear in court, and declined to issue an instanter subpoena to her, for the purpose of her giving testimony as plaintiff's rebuttal witness regarding the ability of her son, defendant Rabb, to satisfy a judgment against him.
Plaintiff originally named as defendants Archie M. Rabb, III; his mother, Lois M. Rabb [Lois W. Jones]; and Maryland Casualty Company as their liability insurer.
*200 Defendants pleaded that the policy of insurance issued by Maryland Casualty Company to Lois W. Jones provided bodily injury limits of liability of $10,000 per person, and that defendants Archie M. Rabb, III and Lois W. Jones were insolvent, and unable to pay any judgment in excess of such $10,000 limits.
The January 30, 1984 pretrial order assigned this case for trial on August 1 and 2, 1984.
On July 5, 1984, plaintiff's counsel caused a subpoena duces tecum to be issued to Mrs. Lois W. Jones, ordering her to produce herself and certain documents at trial. The subpoena duces tecum did not refer to financial records of Archie M. Rabb, III, in the list of documents to be produced at trial. No subpoena to testify was issued to Mrs. Jones.
On July 16, 1984, Mrs. Jones filed a motion to vacate the subpoena duces tecum issued to her. The ground for this motion was that the documents sought by the subpoena duces tecum related to Mrs. Jones' inability to pay any judgment, and such issue could not be tried, because Mrs. Jones had filed a petition in bankruptcy. The filing of a petition in bankruptcy operates as an automatic stay of a tort action against the petitioner in bankruptcy. 11 U.S.C. Section 362; 9 Am.Jur.2d "Bankruptcy," Sections 454, 456, 458, 463.
On July 27, 1984, the trial court granted Mrs. Jones' motion to vacate the subpoena duces tecum, except for the insurance policy covering the insured and/or her son. Defendants produced the insurance policy at trial.
After the defense rested, plaintiff's counsel stated that he had subpoenaed Mrs. Jones and would like her to come to court. The trial court noted the distinction between a subpoena to testify and a subpoena duces tecum. See La.C.C.P. arts. 1351, 1354. The trial judge stated that he found no subpoena to testify issued to Mrs. Jones, only a subpoena duces tecum, and denied plaintiff's motion for an instanter subpoena to Mrs. Jones.
The first paragraph of La.C.C.P. art. 1354 provides:
A subpoena [duces tecum] may order a person to appear and/or produce at the trial or hearing, books, papers, documents, or any other tangible things in his possession or under his control, if a reasonably accurate description thereof is given; but the court in which the action is pending in its discretion may vacate or modify the subpoena if it is unreasonable or oppressive. Except when otherwise required by order of the court, certified copies, extracts, or photostatic copies may be produced in obedience to the subpoena duces tecum instead of the originals thereof. If the party requesting the subpoena does not specify that the named person shall be ordered to appear, the person may designate another person having knowledge of the contents of the books, papers, documents or other things to appear as his representative.
Although the subpoena duces tecum to Mrs. Jones specified that she produce "herself" as well as certain documents at trial, the trial court vacated the subpoena duces tecum before trial, except for the insurance policy. The order vacating the subpoena duces tecum did not except that portion of the subpoena duces tecum ordering Mrs. Jones to produce "herself." Thus, that portion of the subpoena duces tecum was vacated, as well as the documents to be produced (except for the insurance policy).
Plaintiff does not specify that the trial court erred in vacating the subpoena duces tecum to Mrs. Jones before trial. Where no subpoena to testify had been issued to Mrs. Jones, and the trial court had vacated the subpoena duces tecum issued to her (except for the insurance policy), there was no compulsory process directed to Mrs. Jones to appear personally at trial.
Furthermore, the only reason plaintiff wanted Mrs. Jones to testify was concerning the issue of the ability of Archie M. Rabb III, to satisfy a judgment against him. (The issue of Mrs. Jones' inability to satisfy a judgment against her was not *201 tried because she had filed a petition in bankruptcy.)
Plaintiff-appellant argues that she should have been given the opportunity to impeach the testimony of Archie M. Rabb, III, or have an explanation of the documents filed into the record by Lois W. Jones in her capacity of legal tutrix of Archie M. Rabb, III.
Archie M. Rabb, III, testified on direct examination that the only property he owned was an automobile he purchased in November, 1983, for $1,600. He identified two promissory notes: a November 29, 1983 note in the original principal amount of $1,630; a November 30, 1983 note in the original principal amount of $1,650. Plaintiff's counsel was afforded ample opportunity to impeach Rabb's testimony. Plaintiff specifies no part of the appellate record to indicate that Mrs. Jones' testimony would have afforded plaintiff any greater opportunity to impeach Rabb's testimony.
The trial court has much discretion in deciding whether or not to allow rebuttal evidence. La.C.C.P. arts. 1631, 1632; Lea v. Baumann Surgical Supplies, Inc., supra.
Plaintiff-appellant has demonstrated no abuse of discretion in the trial court's refusal to issue an instanter subpoena to Mrs. Jones to testify as a rebuttal witness for plaintiff.

ASSIGNMENTS OF ERROR 4 AND 5
These assignments specify that the jury erred in finding plaintiff Anderson and defendant Rabb were each guilty of 50% fault causing plaintiff's damages.
Only three witnesses testified about the occurrence of the automobile accident sued upon. Defendant Archie M. Rabb, III, testified that he was driving his mother's 1981 Firebird automobile with her permission. He left his Uncle Warren's house, which is located at the corner of Ingleside and Claycut in Baton Rouge. He drove east on Claycut on the way to Tara High School, where he was a senior. (Claycut ends at Jefferson Highway and becomes Goodwood Boulevard east of Jefferson Highway.) He stopped for a red light at Jefferson Highway. Plaintiff Anderson's vehicle was directly in front of him, already stopped for the red light. After the light turned green, both vehicles crossed Jefferson Highway and entered Goodwood Boulevard. Goodwood has two lanes, one going east and the other going west. The line of traffic consisted of a city bus, three cars, plaintiff's car, defendant's car. The city bus slowed to stop. The car directly behind the bus passed the bus, and the next two cars were coming to a stop behind the bus. Plaintiff's car crossed over the double yellow line as if to pass the cars stopping behind the bus. Defendant Rabb planned to stop behind the second car behind the bus, presuming that plaintiff would pass the bus. However, plaintiff whipped back into the lane without signaling, and stopped abruptly in front of defendant. Rabb slammed on his brakes, but he hit plaintiff's car anyway. After the accident, plaintiff's car was in front of defendant's car in the same lane, not touching but inches apart. The middle to left side of defendant's car hit the middle to right side of plaintiff's car; it was not a bumper-to-bumper hit.
On cross examination by plaintiff, defendant Rabb testified that he purchased the Firebird from his mother after the accident "because it was my fault about the wreck and she, you know, really didn't want to have to go down because, you know, of the wreck." When recalled by defendant, he testified: "No, sir, that's not actually what I meant. I mean, it's like when you borrow somebody else's property, you are responsible for it, no matter, you know, what happens. And it wasn't her task, you know, to take on the burden of losing the money on the car. Anytime you wreck a car, it goes down in value."
Plaintiff testified that she was driving a 1973 Ford owned by Joe Going. She was taking her niece, Dana Anderson, to school. She was traveling east on Claycut and stopped for the red light at Jefferson Highway. After the light turned green, she crossed Jefferson Highway and entered Goodwood Boulevard. There were "approximately *202 two cars, it could have been more, in front of me as well as a bus." The bus stopped, the cars stopped, she stopped. On direct examination, she said she was stopped about three minutes before she was hit in the rear by defendant. On cross examination, after actual timing of three minutes by watch, she wasn't sure. The collision knocked her car into the opposite lane of travel, in which there was an oncoming car. She fought to get back into the right lane to keep from colliding with the oncoming car. On direct examination, she said she had to throw on her brakes to keep from running into the back of an automobile. On cross examination, she said she did not know how far she had moved along the street before getting back into the right lane, and could not say how far behind the nearest car she was then. All of the cars in line had been traveling around 20 m.p.h. When the bus stopped, the cars in front of her and she came to an ordinary stop. She could not estimate the speed of Rabb's car. She did not know the distance between her car and Rabb's car after the accident.
Dana Anderson testified on direct examination that she was going to Broadmoor High School, and was riding with Ms. Anderson when the accident occurred "right past Jefferson on Lobdell before it turns into Goodwood." On cross examination, she corrected the reference to Lobdell, acknowledging that they had been on Claycut, crossed Jefferson Highway, and entered Goodwood Boulevard. They were following directly behind a bus, with no vehicles between the bus and their car. She then said "there might have been a car in front of us"; then "I'm almost positive there was a car behind the bus"; then, "I think there was. I can'tI'm not exactly positive. It was almost two years ago, but I"; then, "I'm not saying exactly there was a car, but there is a possibility."
Dana Anderson stated the bus stopped, either to let on a passenger, or to let one off, although she saw neither event occur. She was not actually looking, since she was concentrating on an algebra test she had to take at school. Her aunt stopped her car "quite a few minutes" before the collision occurred. Ms. Anderson did not try to change lanes. On direct examination, she testified their brake lights were on. On cross examination, she acknowledged she couldn't say that for a fact.
The trial court gave a comprehensive legal charge to the jury, which was accepted by both plaintiff and defendants. Appellant's failure to object to jury charges in the trial court precludes an assignment of error on appeal on the basis of giving or failing to give a jury instruction. La.C.C.P. art. 1793 C; Oh v. Allstate Insurance Company, 428 So.2d 1078 (La.App. 1st Cir. 1983).
A consideration of the law governing liability of a following motorist in a rear-end collision reveals that there are at least three possible results as to a following motorist: (1) the following motorist may be liable, where the facts call for application of the general rule that a following motorist who strikes the car ahead is presumed to be negligent, and bears the burden of proving he was not at fault, Eubanks v. Brasseal, 310 So.2d 550 (La. 1975); (2) the following motorist may not be liable, where the facts establish that he kept his vehicle under control, observed the lead vehicle, and followed at a safe distance, Cosse v. Bruley, 445 So.2d 41 (La. App. 4th Cir.1984), or where the accident occurs as the result of a sudden emergency not the fault of the following vehicle and which could not have been reasonably anticipated, Cosse v. Bruley, supra; and (3) both the leading and following motorists may be at fault, where the driver of the lead vehicle stops his car abruptly without giving any warning or proper signal, and the driver of the following vehicle fails to keep a proper lookout. Dykes v. Lowrance, 146 So.2d 171 (La.App. 3rd Cir. 1962).
In the case at bar, the jury heard three inconsistent versions of the accident from the only three witnesses who described it at trial. Plaintiff argued that defendant was liable under (1) above. Defendant argued *203 that defendant was not liable under (2) above. The jury rejected both arguments and found both plaintiff and defendant were 50% in fault in causing the accident.
The trier of fact's reasonable evaluation of credibility should not be disturbed on appeal in the absence of manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
The trier of fact's finding as to the percentages of fault is factual, and such determination will not be disturbed on appeal unless it is clearly wrong. Varnado v. Continental Insurance Company, 446 So.2d 1343 (La.App. 1st Cir.1984).
These principles apply to rear-end collision cases, like all others. See, e.g., McKinley v. Bekins Moving & Storage Co. Inc., 449 So.2d 705 (La.App. 5th Cir.1984), writ denied 456 So.2d 167 (La.1984).
The jury heard these three inconsistent versions of the occurrence of the accident, which presented substantial credibility issues for it to determine. Although the jury's determination may be unacceptable to both plaintiff and defendant, it cannot be said to be manifestly erroneous.
Plaintiff-appellant has thus failed to demonstrate that the jury's allocation of 50% fault to both plaintiff and defendant was manifestly erroneous.

ASSIGNMENT OF ERROR 6
This assignment specifies that the jury erred in awarding plaintiff $15,000 total damages, which the plaintiff contends is inadequate.
Plaintiff has the burden of proving by a preponderance of the evidence the causal connection between the accident and the injuries claimed. Coleman v. Victor, 326 So.2d 344 (La.1976). Whether this burden has been sustained is a question for the trier of fact and its finding will not be disturbed on appeal, unless clearly wrong. Edwards v. Bankers and Shippers Insurance Company of New York, 432 So.2d 1138 (La.App. 3rd Cir.1983).
Similarly, the trier of fact has much discretion in assessing the measure or the amount of damages. La.C.C. art. 1999 (1984). It is only after articulated analysis of facts discloses an abuse of discretion that the award may on appellate review, for articulated reason, be considered either excessive or insufficient. Reck v. Stevens, 373 So.2d 498 (La.1979).
The trial court instructed the jury that "We merely award a sum sufficient to satisfy those damages which were caused by the fault of another," and that plaintiff had the burden of proving her case by a preponderance of evidence, that is, what is more probable than not. Plaintiff-appellant's failure to object precludes an assignment of error on appeal as to such charges. La.C.C.P. art. 1793; Dunaway v. Rester Refrigeration Service, Inc., 428 So.2d 1064 (La.App. 1st Cir.1983), writs denied 433 So.2d 1056, 1057 (La.1983).
Both parties agree that the accident caused plaintiff to sustain a chip fracture of the transverse process of C-4.
The accident occurred on November 10, 1982. Gilbert Ambulance Service took plaintiff from the accident site to the emergency room of Earl K. Long Hospital, where she was examined and referred to her family doctor. No one from Earl K. Long Hospital testified; however, the emergency room record is in evidence. The record indicates, under history and examination, that the plaintiff "did not hit head but jerked neckhit lf arm on door. C/O pain in lower back, neck, left arm."
About eleven days after the accident, plaintiff consulted her family doctor, who referred her to the Bone and Joint Clinic. On November 22, 1982, plaintiff was first seen by Dr. Stephen M. Wilson of the Bone and Joint Clinic. Plaintiff offered Dr. Wilson's medical reports, which were read to the jury. Plaintiff had given to Dr. Wilson a history of injuring her posterior neck region on November 10, 1982. She stated she went to Earl K. Long Hospital, where she was told she had a questionable fracture and was given a support. Dr. Wilson's examination revealed no swelling or *204 inflammation; there was good range of motion and good circulation and reflexes. There was no neurological deficiency. Plaintiff complained of some tenderness in the posterior aspect of her neck, but indicated that the pain in her neck was gradually improving. X-rays revealed a small chip fracture of the transverse process of C-4. Plaintiff was given muscle relaxants and a hard brace to wear, and told to return in ten days.
On December 2, 1982, plaintiff was doing well; the pain was gradually subsiding. X-rays showed the chip fracture was healing satisfactorily. Plaintiff was told to return to Dr. Wilson in three weeks.
Dr. Wilson concluded his December 14, 1982 report by stating he was of the opinion that plaintiff should not have any permanent disability from this injury.
On December 23, 1982, plaintiff returned to Dr. Wilson, still complaining of pain in the neck. The examination was negative for objective findings. X-rays showed the chip fracture to have healed satisfactorily. Dr. Wilson told plaintiff to return in two weeks, and that he felt she could be discharged, and should be able to return to her previous activities.
On January 6, 1983, plaintiff returned to Dr. Wilson. The examination was negative for objective findings. Dr. Wilson told plaintiff she could now return to all her previous activities; that he thought she had no permanent disability as far as her neck was concerned; but that if she continued to have any future problems, she should return to him for a follow-up visit. There were no further medical reports from Dr. Wilson.
There was evidence from which the jury could have reasonably concluded that the only injury plaintiff sustained as a result of this accident was the chip fracture of the transverse process of C-4, for which plaintiff was treated conservatively until discharged, without residual disability, about two months after the accident. The only medical expenses proved for such treatment were $92 for Gilbert Ambulance Service, $142 at Earl K. Long Hospital emergency room; and $585 at the Bone and Joint Clinic (Dr. Wilson), totalling $819.
Plaintiff's work history consisted of a series of jobs of short duration. Plaintiff was not employed when the accident occurred, and had been unemployed from July 30, 1981 until November 10, 1982. Dr. Wilson found no residual disability. Plaintiff testified: "Yes, I believe I could go back to work if I could find a job." The evidence does not support a finding that plaintiff's earning capacity was impaired by this accident. Moreover, no witness testified that plaintiff's earning capacity was impaired by this accident.
Considering that the chip fracture was treated conservatively and healed satisfactorily after two months; that plaintiff was released by the attending physician without residual disability; that special damages amounted to $819; and that no impairment of earning capacity was proved, the jury award of $15,000 was not an abuse of its "much discretion." La.C.C. art. 1934(3).
Nevertheless, plaintiff-appellant contends that she sustained an additional injury as a result of this accident.
Between January 25, 1983, and February 11, 1983, plaintiff was a patient at Our Lady of the Lake Hospital in Baton Rouge. The jury heard the purpose of this hospitalization from Dr. J. Sydney Dann, a dentist and Dr. Richard Gold, a neurologist.
Dr. Dann testified that he first saw plaintiff on January 27, 1983, at Our Lady of the Lake Hospital at the request of Dr. Gold. He requested consultation of an oral surgeon, Dr. Grady Hornsby. They diagnosed a traumatically displaced left meniscus in the left temporal mandibular joint, which means that the jaw joint disc mechanism had been deranged and was pushed out of the socket. They determined that, because of her dental condition, i.e., she had an upper denture which was unstable, that a surgical procedure should be performed to placate the disc. Dr. Dann also extended post-surgical care to plaintiff.
Dr. Dann was of the opinion that the left meniscus had been traumatically displaced, *205 based upon the history given by the plaintiff. The plaintiff told him that she had been in an automobile accident in which she had received a blow to her chin and her face, that she had persistent headaches and jaw pains from November 10, 1982, and had been treated by a neurologist for that condition. The doctor understood from the plaintiff that she had left head pain which persisted from November 10, 1982, until he saw her on January 27, 1983. He had no source of information as to what happened in the accident, other than plaintiff herself.
Dr. Gold first saw plaintiff on January 25, 1983, only two days before Dr. Dann saw her. This was at the emergency room of Earl K. Long Hospital. Plaintiff told him she had hit her head on the steering wheel of her automobile; she had a neck fracture; had numbness across her chest and left arm; was wearing a collar; then on December 21, 1982, she started noticing some pain in the left jaw. Dr. Gold called in Dr. Dann, and participated no further in her treatment.
The only medical testimony that the displaced left meniscus was caused by this accident was Dr. Dann's, based upon the history given by the plaintiff herself.
The weight to be given the testimony of experts is largely dependent upon their qualifications and the facts upon which their opinions are based. Middle Tennessee Council, Inc. v. Ford, 274 So.2d 173 (La.1973).
The trier of fact has to weigh both medical and lay testimony in assessing damages, and must consider the credibility and relative qualifications of experts and credibility of all witnesses, to arrive at a result. Cason v. Diamond M Drilling Company, 436 So.2d 1245 (La.App. 1st Cir.1983), writ denied 441 So.2d 1221 (La.1983).
The trial court instructed the jury in judging the credibility of witnesses, as well as evaluating the opinions of experts. The trial judge instructed the jury that "even though a person might be an expert witness, you as a juror can ascertain whether or not they had enough facts to make that decision." Plaintiff-appellant's failure to object to such charges precludes an assignment of error on appeal as to such charges. La.C.C.P. art. 1793; Dunaway v. Rester Refrigeration Service, Inc., supra.
Plaintiff told Dr. Dann that her head or jaw pains started on the date of the accident, November 10, 1982. She told Dr. Gold she had such pain starting on December 21, 1982.
Plaintiff's testimony concerning the mechanics of the accident was inconsistent with that of her niece, Dana Anderson. Plaintiff said the right side of her face hit the steering wheel. The Earl K. Long Hospital emergency room record indicates that she did not hit her head but jerked her neck. Dr. Wilson's reports indicate that plaintiff's history was that she had injured her posterior neck region on November 10, 1982. Further, Dr. Wilson's examination revealed no swelling or inflammation, a good range of motion, no neurological deficits, and good reflexes. This medical evidence does not bear out plaintiff's contention that she hit her head or face against the steering wheel when the accident occurred.
In evaluating plaintiff's credibility on the issue of the causal connection between the accident and the displaced meniscus, the jury was also entitled to consider plaintiff's credibility concerning other matters. Plaintiff testified by deposition before trial that she had previously injured her elbow, resulting in a lawsuit for workers' compensation benefits in which she was represented by a named attorney; at trial, she categorically denied such a suit. Plaintiff testified she had been stopped for approximately three minutes before defendant struck her car; after timing three minutes by watch, she couldn't discern the time period.
The jury saw and heard the witnesses. There is no evidence that the jury disregarded the trial court's instructions on weighing credibility and considering the factual basis of expert opinions.
Plaintiff has demonstrated no error in the jury's determination of credibility of witnesses and sufficiency of plaintiff's evidence *206 on the issue of whether or not the accident caused plaintiff's displaced meniscus. We find that the jury did not abuse its discretion in failing to award damages for such injury and the medical expense related to it.
The jury's conclusion that the chip fracture of the transverse process of C-4 was caused by the accident, and the displaced meniscus was not, explains the jury's award of $15,000 damages.
Accordingly, for the reasons assigned we affirm the judgment at plaintiff-appellant's costs.
AFFIRMED.