544 So.2d 577 (1989)
Paul FEYERABEND
v.
STATE of Louisiana, DEPARTMENT OF WILDLIFE & FISHERIES, McKee Craft and Ira's, Inc.
No. CA 88 0692.
Court of Appeal of Louisiana, First Circuit.
May 16, 1989.
*578 R. Scott Ramsey, Jr., Berwick, for plaintiff.
B.J. Rawls, Morgan City, for Ira's, Inc.
Patrick A. Juneau and Juneau, Hill, Judice, Hill & Adley, Lafayette, for Lanness K. McKee & Co., Inc.
Julius W. Grubbs, Jr. and Haik & Minvielle, New Iberia, for State of La. Through Dept. of Wildlife & Fisheries.
Before CARTER, LANIER and LeBLANC, JJ.
LeBLANC, Judge.
This personal injury suit was filed under the Jones Act and general maritime law. The primary issues raised herein are whether plaintiff was guilty of contributory negligence and whether the damages awarded to plaintiff are inadequate.
On July 4, 1986, plaintiff, Paul Feyerabend, was employed by the Louisiana Department of Wildlife & Fisheries (Department) as a coastal enforcement agent. On that date, plaintiff and his partner were *579 conducting a safety patrol in a seventeen foot fiberglass boat assigned to plaintiff by the Department. The vessel had twin center side consoles, a seat immediately behind each console and a walk-through windshield. At the time of the accident, plaintiff was standing behind the passenger console while his partner accelerated the vessel. The passenger console suddenly shifted position, striking plaintiff in his left knee. The blow caused him to fall backward onto the arm of the passenger seat, before finally sliding into the seat. As a result, plaintiff sustained injuries to his left knee and back. The knee injury resolved itself within a short time, but plaintiff was still under treatment for his back injury at the time of trial.
In any event, plaintiff filed suit against the State of Louisiana (State), through the Department of Wildlife & Fisheries; Lanness K. McKee & Company, Inc., the manufacturer of the vessel involved; and, Ira's, Inc., a boat repair facility. Following trial, the court rendered judgment on October 21, 1987, in favor of plaintiff and against the State fixing plaintiff's damages at $70,000.00 in general damages and $15,000.00 for loss of earning capacity. However, the trial court also concluded plaintiff was guilty of 25 percent contributory negligence and reduced his award accordingly. Plaintiff's demands against the other defendants were dismissed. This judgment was signed on November 9, 1987.
Plaintiff has appealed, alleging the trial court erred in finding he was contributorily negligent, in awarding an inadequate amount for general damages and in failing to award damages for loss of future earnings. The State answered this appeal, contending that a greater percentage of contributory negligence should have been allocated against plaintiff.[1]

CONTRIBUTORY NEGLIGENCE
It is plaintiff's position that he was guilty of no contributory negligence, while the State maintains that plaintiff should have been assessed with at least fifty percent contributory negligence.
The trial court's finding that plaintiff was contributorily negligent had two separate bases. First, the court found plaintiff was negligent in standing rather than sitting while the vessel accelerated from a complete stop. Secondly, it concluded "plaintiff should have been aware ... and put on guard that there was a problem with ... [the passenger] console that needed correction" and he was negligent in failing to discover and report the problem. The court assessed plaintiff with a total of 25 percent contributory negligence, without indicating what percentage was being assessed on each of these bases.
The trial court's allocation of percentages of fault is a factual determination which should not be disturbed in the absence of manifest error.[2]Anderson v. *580 Rabb, 484 So.2d 196 (La.App. 1st Cir.), writ denied 489 So.2d 248 (La.1986). In finding that plaintiff was negligent for standing while the vessel was being accelerated, the trial court gave the following reasons:
I find that the plaintiff standing in the boat when the boat was accelerating to get on step is a negligent act. Had he not been standing up, then, from the evidence, his knee would not have been hit. And if he had been sitting down, he would not have been thrown down, causing the problem in the lumbar area. There may be no rule which required him to sit. But the seats are there for that purpose. He did not have to stand, not at that time. And I think it was not prudent, under the circumstances, for him to do it. And, certainly, this contributed to his injuries ...
After careful consideration, we are unable to say that the trial court's conclusion on this issue is manifestly erroneous.
However, we have reached a different conclusion with respect to the finding that plaintiff was negligent in failing to report a problem with the passenger console. The trial court's finding was based on the testimony of two marine surveyors who testified for the defense to the effect that their examination of the vessel indicated the passenger console had been loose for some time prior to the accident. From this conclusion, they postulated that there would have been vibrations and noise created by the loose console which should have been noticeable to plaintiff. While the marine surveyor testifying on behalf of plaintiff agreed that the console had been loose for some time, he was more reticent to conclude that the vibrations and noise it would have created would have been sufficient to alert plaintiff to the problem. Plaintiff, himself, testified that he noticed no noise or vibrations prior to the accident. His partner substantially corroborated this testimony.
We note none of the experts actually heard the motor of the vessel in question in operation, so as to familiarize themselves with the level of noise it created. Under these circumstances, and in the face of the testimony of plaintiff and his partner indicating they noticed no noise or vibrations, the testimony of defendants' experts and the conclusion of the trial court that plaintiff should have detected the vibration and heard the rattling above the noise of the motor was, at best, speculative. The trial court committed manifest error in finding plaintiff guilty of contributory negligence on this basis.
If the trial court had indicated the percentage of contributory negligence being assessed to plaintiff on this basis, we would simply reduce the allocation of contributory negligence against plaintiff by that percentage. We could then review the remaining assessment of contributory negligence against plaintiff for standing in the vessel under the manifest error standard. Unfortunately, we are unable to do so because the record does not indicate the percentage of contributory negligence the trial court assigned on each of these bases. Consequently, since the full record is before us, we must make a de novo determination of the percentage of contributory negligence which should be allocated against plaintiff for his negligence in standing while the vessel was accelerating. See, Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975). Considering all of the circumstances present, we conclude an assessment of 15 percent is appropriate. Accordingly, the contributory negligence assessed against plaintiff is reduced from 25 percent to 15 percent.

QUANTUM
Plaintiff also complains that $70,000.00 is inadequate to compensate for his general damages and the trial court erred in not making an award to him for loss of future earnings.
A trial court has great discretion in making an award of general damages which will not be disturbed upon review in the absence of an abuse of discretion. Reck v. Stevens, 373 So.2d 498 (La.1979). Each case must be decided on its own particular facts. Id.
*581 In this case, there were numerous factors relevant to a determination of plaintiff's general damages. Some of the more significant of these factors were: plaintiff's history of back problems, the fact that he consulted a physician two to three months before the accident in question; the fact that he continued to perform his job until approximately one month before trial, although he testified he was working in pain; and, the fact that no surgery had been performed or is recommended at this point, although one physician indicated plaintiff was at high risk for surgery. In addition to considering these and other relevant factors, the trial court fully evaluated the testimony of all the medical experts and gave extensive oral reasons for the amount awarded. After carefully examining the complete record, we find that the amount awarded was not an abuse of the trial court's great discretion. We adopt as our own that portion of the trial court's reasons for judgment pertaining to this issue and attach it hereto as Appendix A.
Finally, plaintiff contends that the trial court erred in not awarding him damages for loss of future earnings. At the time of trial, plaintiff was still employed in the position he held prior to the accident, although he was on leave for approximately a month before trial. Additionally, plaintiff had no lost past wages. It was unclear whether he would have any loss of future earnings although he testified he had been told he would be terminated after the trial of this matter. The trial court obviously concluded, however, that an award for loss of future earnings was too speculative under the circumstances existing at that time. We are unable to say that this decision was an abuse of the trial court's discretion, based upon the evidence before the court at that time.
Plaintiff argues in brief that this court should consider the fact that he actually was terminated from his job shortly after trial. As evidence of his termination, plaintiff urges this court to consider a termination letter introduced by him at a hearing held on a rule for maintenance and cure, which occurred on February 18, 1988, well after rendition of the judgment appealed from.
We are unable to do as plaintiff requests. In reviewing a judgment, an appellate court cannot consider circumstances which occurred subsequent to that judgment or evidence not before the trial court when it rendered judgment. Williams v. Burnham, 185 La. 791, 171 So. 33 (La.1936); Wiener v. Crystal Oil Refining Corporation, 183 La. 879, 165 So. 131 (La.1935); Morgan v. Allstate Ins. Co., 393 So.2d 324, 329 (La.App. 1st Cir.1980); Smith v. Smith, 430 So.2d 766 (La.App. 5th Cir. 1983). Furthermore, even assuming for the sake of argument that we could consider the termination letter, this alone does not establish that plaintiff will suffer a loss of future wages. The only physical limitation plaintiff's physicians ordered was that he not engage in heavy manual labor or repetitive bending or lifting. He was not assigned any percentage of disability. Plaintiff was earning a relatively low salary at the time of his injury. The record does not establish that he will be unable to perform other work earning a similar salary or that such work as he could perform was unavailable.

DECREE
For the above reasons, the judgment of the trial court is amended to reduce the percentage of contributory negligence attributable to plaintiff and the resulting reduction of the award in his favor from twenty-five percent to fifteen percent. The judgment of the trial court is affirmed in all other respects. Plaintiff and the State are each to pay one-half of the costs of this appeal in the amount of $262.50 each.
AMENDED AND, AS AMENDED, AFFIRMED.

APPENDIX A
Now, we move to the question of damages. I find that the plaintiff wassustained an injury to his left knee which resolved itself in fairly short order and that hehe aggravated, at least, a pre-existing condition in his lumbar-sacral area. His treating physician over the years was Dr. *582 Herman Walker, who referred him to Dr. Cenac, an orthopedic surgeon, when the problem did notI'm sorryreferred him to Dr. A.D. Walker when the problem did not resolve itself.
Both of these doctorsand incidentally, Dr. A.D. Walker, in November of 1986, did examine and evaluate the plaintiff for his back as well as his knee. Now, in time, the plaintiff was also seen by Dr. Cenac, another orthopedic surgeon. Dr. Cenac acknowledges a prior lumbar-sacral strain and a protruding disc. Now, Dr. Herman Walker tells us that this disc at L5-S1 was protruding about three millimeters centrally in a 17 millimeter canal, whichwhich indicates it was not pressing on anything or that there was no nerve root impingement, that, therefore, surgery would not be indicated. This they verify from the CT scan. The CT scan and the x-rays taken on December the 10th of 1985, while they show a problem, don't show the same diminished space, in their view, as after the accident. Now, x-rays taken on September 9th, 1987, in the view of Dr. Cenac, show diminished space, and he concludes that there was a disc collapse which is consistent with herniation. And the MRI of June the 27th, 1987, in his opinion, confirm this. He talks about surgery, and I get the impression from his testimony that he thinks it will be forthcoming but he's not recommending it right now, which means he's not absolutely sure it will be necessary. Dr. Herman Walker basically agrees with Dr. Cenac, and on the question of disability, he defers to Dr. Cenac, who feels that the plaintiff can't go back to the same enforcement duties he had been doing over the years. Dr. A.D. Walker, on re-examination of the plaintiff and discussing his prior acquaintance with the plaintiff, feels that the MRI doesn't show anything that wasn't there before and feels that thereeven after the July 4th, 1986 incident, that there was still no nerve root impingement. And I think the better view of his testimony is that the plaintiff should not be performing the duties of a law enforcement agent but that that would have been his recommendation even prior to the July 4th, 1986 accident.
Now, we have to understand that Dr. Herman Walker was the plaintiff's family physician and that the plaintiff got to Drs. Cenac and A.D. Walker apparently through Dr. Herman Walker. But the point I'm making is that these were not doctors who evaluated the plaintiff for the defendants. Thesethe plaintiff saw these doctors through no efforts of the defendants.
Of course, Dr. VogelI read that report, and, of course, we had some testimony about it from Dr. Walker. But Dr. Vogel examined the plaintiff on April 3rd, 1986, three months before the instant accident, diagnosed an acute lumbar-sacral strain, acute but which was resolving satisfactorily.
The most I can make of Dr. Aprill, the radiologist's testimony, is that the MRI indicates disc pathology. But Dr. Aprill is unable to be conclusive or definitive as to exactly what that pathology is and that, in any event, there was no nerve compression indicated by the MRI. And what he says about the CT scan again is not definitive. He seems to say that it could be considered normal or abnormal but it doesn't tell us enough, and because of that, he'd rather call it normal.
Well, these are all, as I say, you might say plaintiff doctors or plaintiff's doctors and not the defendants'. I have to try to consider all of that together and also consider plaintiff's history of back problems. The evidence is that in 1978 he was involved in an accident, had problems, and there was even court action involved on this and some others, indicating that they were of some seriousness. The same thing, he had problems in 1981 and '82, in January of 1985. He was involved in an automobile accident in April of '85 and sustained low back injuries in that. All of these seem to involve lumbarsacral strains. I'm mindful of the allegations in his lawsuit resulting from the 1985 accident wherein he alleged permanent partial disability and temporary total disability, and as I said at the time the objection was made on that evidence, that I thought it was proper evidence; I'd have to consider it along with everything else and give it appropriate *583 weight. Even after the accident, on October 22nd, 1986, the plaintiff was involved in some sort of tussle in the vessel which could have had some effect on his back. The point I'm trying to make is that the plaintiff had lower back problems over the years. And I suppose that we have to conclude that each one makes his back a little worse. And so, certainly, whatever problems he has right now, as testified to by the doctors, have to be, to some significant degree, I would think, the result of his pre-existing condition or conditions.
It's axiomatic that the rule of law is that you take a victim as you find him. And regardless of what problems that he had before, if you aggravate a pre-existing condition, you're responsible if you cause it for the extent of the aggravation. But you are not responsible for his condition as it was immediately prior to the accident.
I've looked at the jurisprudence. I have tried to analyze those awards in terms of comparing not only the injuries in those cases with the instant one but taking into account the pre-existing condition of the plaintiff's back in this case, which makes it different from those cases. We have to remember that the plaintiff, until a little about a month ago, when this litigation was right around the corner, was working, doing the same duties he did before July 4th of 1986. There is testimony from him and Agent Soignier that he worked in pain, although he was able to do the work. He did do the work. In fact, the testimony from Captain Chauvin is that he remained one of the top menagentsenforcement agents in production in the State after the accident just as he was before.
Bearing all these things in mind, I've concluded that a proper general damage award, to include pain and suffering, loss of quality of life and that sort of thing, should properly be seventy thousand dollars ($70,000.00).
NOTES
[1] In its answer to plaintiff's appeal from the judgment of November 9, 1987, the State attempts to raise an issue relating to the correctness of a subsequent judgment awarding plaintiff maintenance and cure, which was not rendered until February 24, 1988. This issue is not properly before this court and will not be considered. The law is clear that appellate courts cannot review matters occurring after rendition of the judgment under review. Williams v. Burnham, 185 La. 791, 171 So. 33 (La.1936); Smith v. Smith, 430 So.2d 766 (La.App. 5th Cir.1983). The correct procedure for the State to have obtained review of the judgment of maintenance and cure would have been by appeal of that particular judgment.
[2] In this suit, plaintiff sought recovery under both the Jones Act and general maritime law. However, the trial court concluded that plaintiff did not establish the existence of any negligence, a requisite for recovery under the Jones Act. Naquin v. Travelers Ins. Co. 504 So.2d 1032 (La.App. 1st Cir.1987). Instead, plaintiff's recovery was based on the principle of unseaworthiness, which had its basis in general maritime law. The basis of plaintiff's recovery is significant in that it could affect the standard of review to be applied by this court. The standard of review applied in state court claims under general maritime law is the same as that normally applied by our appellate courts. Daigle v. Coastal Marine, Inc., 488 So.2d 679 (La. 1986). However, there is some question as to whether the state or the federal standard of review is applicable in state appellate courts on Jones Act claims. Daigle, footnote 3. In any event, in this case the usual state court standard of appellate review is applicable, since plaintiff's recovery was based on general maritime law.