GUIDRY, Judge.
Plaintiff, David Irving, brought this suit against Audrey Isles, Isles’ liability insurance carrier, State Farm Mutual Automobile Insurance Company (State Farm), Melody Gunter Slocum, and Slocum’s liability insurance carrier, Fireman’s Fund Insurance Company (Fireman’s Fund), seeking to recover damages for personal injuries alleged to have been sustained when Isles’ vehicle collided with the rear end of his parked vehicle. Isles and State Farm answered the claim, asserting that the accident was caused by the joint and combined negligence of Irving and Slocum, or alternatively by the contributory negligence of Irving. State Farm filed a third party demand against Fireman’s Fund, claiming subrogation to the rights of Irving and Isles for payments previously made to them for property damage totaling $1,754.99. Slocum and Fireman’s Fund answered the petition, alleging the negligence of Isles and the contributory negligence of Irving in causing the accident. Fireman’s Fund filed a cross-claim against State Farm for indemnification or contribution. Fireman’s Fund and Slocum subsequently amended the cross-claim, urging the existence of additional available insurance coverage provided by State Farm under a policy of uninsured or under-insured motorist coverage on Irving’s vehicle.
*870 The case was tried to a jury which found Irving 90% at fault and Isles 10% at fault in causing the accident. No fault was attributed to Slocum. The jury also concluded that Irving was not entitled to any special or general damages. The trial court rendered judgment, pursuant to the jury verdict, rejecting plaintiffs demands and casting him with all costs. Irving filed a motion for a judgment notwithstanding the verdict and alternatively, for a new trial, both of which were denied.
Plaintiff appeals urging that the trial court erred when it found no fault on the part of Slocum and in its assessment of fault as between Irving and Isles; and, in its failure to award any damages to Irving. Defendants, Isles and State Farm, answered the appeal, seeking affirmation of the trial court's judgment. In the alternative, they seek enforcement of their third party demand against Fireman's Fund if the judgment is modified or reversed. Isles and State Farm argue on appeal that Isles was not guilty of any negligence, but rather was faced with a sudden emergency created by Slocum.
FACTS
On November 15, 1984, at approximately 4:45 p.m., Audrey Isles was traveling south on Louisiana Highway 107. Highway 107 is a two-lane paved highway which runs in a north-south direction between Pineville and Marksville in Rapides Parish. The shoulders of Highway 107 are hard surfaced. Just prior to the accident, David Irving had parked his pickup truck, which was headed south, alongside another truck on the shoulder of Highway 107 directly in front of the “Sunrise Grocery” store. The Irving truck was parked between the entrance to the store’s parking lot and its exit onto the highway.[1] After parking, Irving remained in the truck while a passenger went into the store to make a purchase. Irving’s truck was parked in a designated “No Parking” zone. Shortly thereafter, Melody Gunter Slocum, driving a 1978 Chevrolet Suburban, desiring to turn north on Highway 107, attempted to exit the grocery store’s parking lot from the exit located just south of Irving’s parked vehicle. As Irving’s truck was parked near the roadway, Slocum had to pull her vehicle up to the white line on the road in order to view the southbound oncoming traffic on Highway 107. Slocum observed the Isles vehicle traveling south, but concluding that she had enough time to cross over the southbound lane of traffic and turn north, she proceeded out of the parking lot. When Isles observed Slocum’s vehicle pull out into her lane of traffic, she slammed on her brakes and skidded to the right, into the left rear of Irving’s parked truck, causing the glass rack to slide forward, jamming the driver’s door shut.
State Trooper Charles T. Rawlson, the investigating officer, testified as to his own observations at the accident scene. Trooper Rawlson stated that the accident, which he classified as “minor”, occurred at dusk on a cloudy day. When Rawlson arrived at the scene, he found Slocum's suburban parked on the northbound shoulder of Highway 107, approximately 100-150 feet north of Sunrise Grocery. Isles’ vehicle was partially in the southbound lane and partially on the shoulder of the road, approximately 10 feet from where it had struck Irving’s truck. Irving’s truck was parked on the shoulder of the southbound lane of traffic, approximately 2½ to 3 feet off of the traveled portion of the highway.
The only two eyewitnesses to the accident were Slocum and Isles, who gave different accounts of the accident. Slocum told Trooper Rawlson that when she pulled out into the highway, Isles' vehicle was “quite a ways away” and that it appeared to her that Isles just panicked and locked her brakes. Isles, on the other hand, testified that Slocum suddenly pulled out in front of her, causing her to slam on her brakes in order to avoid a collision.
Rawlson found that the Isles vehicle left 111 feet of skid marks from its left front *871 tire and 45 feet of skid marks from its left rear tire. No skid marks were left from the right tires. The speed limit at this location of Highway 107 is 55 mph and Rawlson observed no evidence to indicate that Isles had been exceeding the speed limit. Isles stated to Rawlson that she was traveling approximately 45 mph. Rawlson noted that the damage to the Irving truck was minor, being confined to the left side of the vehicle. There were no complaints of injury after the accident and Rawlson did not observe any physical signs of injury to either Irving or Isles.
David Irving testified that he and his employee, Bobby Thevenot, were on their way to a job when the accident occurred. Irving had parked his truck in front of Sunrise Grocery because there were no available parking spaces in the store’s parking lot. He stated that he waited in the truck while Thevenot went into the store to purchase some cigarettes. He was looking to his right, in the direction of the store, when he “... heard the sliding of the tires and the impact and then realized that” he had been hit by Isles’ vehicle.
Audrey Isles testified that, at the time of the accident, the sun was starting to go down, although it was not yet necessary for her to turn on her headlights. She stated that she noticed Irving’s truck parked alongside another truck in front of Sunrise Grocery. She stated that she could also see the front end of Slocum’s vehicle on the other side of the glass truck. Isles testified to the events leading up to the accident as follows:
"... I didn’t know — I did not know who it was or how fast it would move or anything and that is when I started putting on the brakes because the — uh—I don’t know how fast I was going. I figured I was going around forty or forty five, but I wasn’t — I wouldn’t swear to it, but the rate I was coming and — and whenever I seen her pull out — the front end of her car pull out between the two tr — uh—ahead of these two trucks, well I could see her when she crossed over the front end of her car in my lane of traffic is when I started putting on the brakes and I thought that I was somewhat around close to the — to the drive-in on the Pineville side. I — you know, I don’t remember that far back ...”
When asked what would have happened had she not applied her brakes when she did, Isles stated:
“Well, I just don’t know, but whenever I looked and seen her — her pull out just the front end of her car, I didn’t know who was behind the wheel or how fast it would move so — so naturally just — just reaction I put on the brakes so that I could stop because at the rate that I was going whatever if she didn’t hurry up and move out, it looked like to me that I'd of hit her broadside. Now, it migh-ta — I mighta not of, but that’s the way it looked to me.”
In response to the question of whether she thought it was necessary for her to apply her brakes as forcefully as she did, Isles responded, “Well, it [sic] just a matter of— of time that I had to think as I said before, I didn’t know who it was driving or how fast that they would move.” Isles did concede that she was restricted from driving at night because of her eyesight. However, she stated that it was not dark at the time of the accident and that Slocum did not have any lights on.
Melody Gunter Slocum testified that she drove into the parking lot at Sunrise Grocery with the intention of purchasing a few items. Upon seeing a large crowd of people at the store, she decided to try another store. She proceeded to drive out of the store’s exit, located just south of Irving’s parked truck. Before she reached the roadway, Slocum looked behind Irving’s parked truck to see if anything was approaching on Highway 107. At that time, she noticed Isle’s vehicle “far down the road”. She then pulled the suburban up to the white line on the roadway to get another look at the oncoming traffic. Slocum looked past Irving’s parked truck and again saw Isle’s vehicle heading in her direction. Slocum stated at trial that, “I saw that the car was down the road enough to give me time to go ahead and get out and I went ahead and pulled out”. She testified that she completed her turn into *872 the northbound lane of Highway 107 and then noticed Isles squeezing her steering wheel with an expression of panic on her face as she started applying her brakes and slid into the parked glass truck. Slocum then pulled over to the shoulder of the road. Slocum testified that she had her lights on at the time of the accident. She also stated that the Isles’ vehicle was far enough away for her to safely enter the highway.
Jeanne Labro, owner of Sunrise Grocery, testified that "... when I turned around and looked when we heard the tires squeal and turned around and looked it all happened so quickly that her car had hit the parked truck and the truck had moved and at that time Mrs. Slocum’s car or Suburban was turning onto the highway. She was on the highway.” Labro also described the area in which Irving had parked his truck as follows:
“There’s a no-parking sign that the State put up there shortly after we had taken the store over, because like I said there were several wrecks out there and there was — uh—a boy that was killed before we took over and it's a wide area — it's more than a shoulder of the road. You can fit two car lengths easy because the river crew used to park out there and you can fit two cars side by side before you even completely touched and get to the highway and his truck was parked right there by the no-parking sign.”
Gene Byron Moody, recognized by the court as an expert in engineering and accident reconstruction, testified on behalf of Slocum. Moody stated that he went out to the accident site on January 24, 1986 (almost two years after the accident) to conduct various tests and take photographs and measurements. He was supplied with the police report of Trooper Rawlson and the depositions of Slocum, Isles and Irving. Moody observed that the north and southbound lanes of travel were each 12 feet wide with 10 feet wide asphalt shoulders. The area in which Irving was parked included a shoulder 10 feet wide plus 12 feet of additional pavement. Moody based his conclusions on the physical findings as reported by Trooper Rawlson and upon the following assumptions: Irving’s parked truck was 40-50 feet north of the parking lot exit from which Slocum emerged; Irving’s truck was 2½ to 3 feet from the edge of the traveled portion of Highway 107; and, normal reaction time is three-fourths of a second for perception and three-fourths of a second for reaction. Based upon the above, Moody reached the following conclusions: (1) Irving’s truck obscured the vision of both Isles and Slocum; (2) Isles was traveling approximately 50 mph; (3) under normal conditions, Isles would have been 281 feet away from Slocum’s vehicle when she first noticed Slocum’s vehicle enter her lane of travel; (4) had Isles not applied her brakes but continued her southward movement at approximately 45-50 mph, she would not have been in any danger of striking Slocum’s vehicle; and, (5) Slocum had “plenty of room” to make a safe left turn across the southbound lane of traffic into the northbound lane.
LIABILITY
The testimony of Isles and Slocum is diametrically opposed. Slocum testified that she had sufficient time to complete her left turn maneuver from the Sunrise parking lot without creating a traffic hazard and Isles testified to the contrary. Moody, the accident reconstructionist, concluded that had Isles not applied her brakes she would not have been in any danger of striking Slocum’s vehicle. The jury obviously relied on the testimony of Slocum and Moody in finding Slocum free of fault. We do not find that the jury clearly erred in this regard.
Neither Slocum nor Isles were able to state exactly how far apart their vehicles were when Isles first perceived that Slocum would enter Highway 107. The only evidence on this point appears in the testimony of Moody who estimated that the Isles vehicle was 281 feet away when Isles first noticed that Slocum was proceeding into her lane of traffic. There is nothing in the record reflecting that this estimate is unreasonable or inaccurate. Accepting this as a fact established by the record, we *873 conclude that the jury did not clearly err in finding Slocum to be without fault.
The duty of a driver entering a highway from a private road or driveway is set forth in La.R.S. 32:124 as follows:
“The driver of a vehicle about to enter or cross a highway from a private road, driveway, alley or building, shall stop such vehicle immediately prior to driving onto a sidewalk or onto the sidewalk area extending across any alleyway or driveway, and shall yield the right of way to any pedestrian as may be necessary to avoid collision, and shall yield the right of way to all approaching vehicles so close as to constitute an immediate hazard.”
In interpreting this statute, the jurisprudence has repeatedly held that a driver entering a highway from a private driveway has a primary or high duty to avoid a collision. This duty becomes more onerous as the hazard increases and requires a motorist to use every reasonable means available to ascertain that his entry onto the highway may be made in safety. West v. Ryder Truck Lines, Inc., 218 So.2d 106 (La.App. 3rd Cir.1969), writ refused, 254 La. 130, 222 So.2d 882 (La.1969); Hardee v. St. Paul Fire and Marine Insurance Company, 445 So.2d 771 (La.App. 3rd Cir. 1984). Thus, the test is not whether the two vehicles would have actually collided, but rather whether the oncoming vehicle with the right of way was so close as to constitute an “immediate hazard”.
In Zager v. Allstate Insurance Company, 211 So.2d 744 (La.App. 3rd Cir.1968), this court explained the duty of a motorist entering a public highway from a private drive as follows:
“The primary duty of avoiding a collision rests upon the driver of a vehicle entering a public highway from a private driveway, such a driver being required to keep a lookout for vehicles upon the highway and to not enter the highway until it becomes apparent to him, or until it should become apparent to a reasonably prudent person, that he can do so safely. LSA-R.S. 32:124; Jones v. Travelers Ins. Co., 149 So.2d 441 (La.App. 3d Cir.1963); Holland v. United States Fidelity & Guaranty Company, 131 So.2d 574 (La.App. 2d Cir., 1961); Vidrine v. Simoneaux, 145 So.2d 400 (La.App. 3d Cir.1962); Chandler v. Grain Dealers Mutual Insurance Company, 131 So.2d 606 (La.App. 2d Cir., 1961). The motorist intending to enter a main highway from a private driveway, however, is not required to desist from making his entry as long as any traffic is in sight, but his duty is only to refrain from doing so until it should appear to a reasonably prudent person that the entry can be made in safety and without obstructing the passage of traffic from either side. Higginbotham v. Frazier, 92 So.2d 89 (La.App. 1st Cir.1957, Cert, denied); Easter v. Davis, 153 So.2d 463 (La.App. 4th Cir.1963).” (Emphasis ours).
As in Zager, we conclude that the jury did not clearly err in determining that Slocum’s entry onto Highway 107 was reasonable and did not create an immediate hazard to oncoming traffic. Slocum had only to travel a distance of 12 feet in order to clear Isles’ lane of traffic. Isles was 281 feet away, traveling at a speed of 45 miles per hour or approximately 66 feet per second when Slocum entered the highway. In addition to the above, the record reflects that the Isles vehicle came to a complete stop some fifty feet north of the driveway from which Slocum had exited. Although the Isles vehicle collided with the Irving truck, the collision was minimal and could have had little effect upon the stopping distance. Considering these facts, Slocum’s testimony that she had completed her turn and was fully in the northbound lane when Isles applied her brakes is reasonable. The jury so concluded and we do not find this determination clearly wrong.
We next turn to the alleged fault of Isles. The duty of a driver on a favored street is the much lesser duty of ordinary care and that driver generally may rely on the assumption or presumption that those vehicles entering the roadway from less favored positions such as a private drive will not drive into the path of favored traf- *874 fie. The motorist who is otherwise proceeding lawfully on the favored street is not required to look out for or search in anticipation of careless drivers who might enter his right of way from a private driveway in violation of La.R.S. 32:124. Vidrine v. Simoneaux, 145 So.2d 400 (La.App. 3rd Cir.1962); Davis v. Galilee Baptist Church, 486 So.2d 1021 (La.App. 2d Cir.1986).
In the instant case, Isles was driving within the speed limit on Highway 107. Isles testified that she saw the front end of Slocum’s vehicle at the driveway leading out of Sunrise Grocery, thereby alerting her of Slocum’s intent to enter Highway 107. However, Isles asserts on appeal that Slocum’s entry onto the highway created a sudden emergency for which Isles cannot be held liable. The jury apparently concluded otherwise and we have found no clear error in that determination.
The law governing sudden emergency was set out by the Louisiana Supreme Court in Hickman v. Southern Pacific Transport Company, 262 La. 102, 262 So.2d 385 (1972), which in pertinent part provides:
“One who suddenly finds himself in a position of imminent peril, without sufficient time to consider and weigh all the circumstances or best means that may be adopted to avoid an impending danger, is not guilty of negligence if he fails to adopt what subsequently and upon reflection may appear to have been a better method, unless the emergency in which he finds himself is brought about by his own negligence.”
As discussed earlier, Slocum’s entry onto the highway did not create an emergency situation. We find, presumably as did the jury, that Isles overreacted to the situation and is not entitled to invoke the sudden emergency doctrine. For these reasons, we find no clear error in the jury’s conclusion that Isles was partially at fault in causing the accident which is the subject of this litigation and next consider the fact-finder’s allocation of fault between Isles and Irving.
The trial court found Irving 90% at fault and Isles 10% at fault. Negligence is actionable where it is a cause-in-fact of the injury and such negligence is shown to be substantial and proximately related to the harm which occurs. Dixie Drive It Yourself System New Orleans Co. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (La.1962); Lombard v. Sewerage and Water Board of New Orleans, 284 So.2d 905 (La.1973); Ishee v. State of Louisiana, Department of Transportation and Development, 413 So.2d 1362 (La.App. 1st Cir.1982).
In the instant case, Irving had parked his truck in a designated “No Parking” zone, between the two entrances from Highway 107 to the Sunrise Grocery parking lot. The apparent intent for positioning the “No Parking” signs at this location was to prevent parked vehicles from obstructing the view of persons coming out of the parking lot, as well as the view of those traveling south on Highway 107 to see cars emerging from the parking lot. Another reason for the “No Parking” signs at this location was to keep the highway shoulder clear for emergency travel.
The trial testimony indicates that Irving’s truck did not completely obstruct the view of either Slocum or Isles. Slocum testified that before she arrived at the traveled portion of Highway 107, she looked behind Irving’s parked truck and saw Isles’ oncoming vehicle. She then pulled up to the white line on the highway and looked past Irving’s vehicle and again was able to see Isles’ oncoming vehicle. Isles also testified that she could see the front part of Slocum’s Suburban stopped at the entrance to the highway. Although Irving’s parked vehicle did not completely obstruct the vision of either Slocum or Isles, it obviously impeded their view. Slocum testified that she had to pull up to the traveled portion of the highway and lean forward past Irving’s vehicle in order to see the oncoming traffic. And Isles was only able to see a small portion of Slocum’s vehicle. Additionally, had Irving’s truck not been illegally parked on the highway shoulder, one can assume that the accident would not have occurred, *875 for there would have been no vehicle on the highway’s shoulder for Isles to run into.[2] She would have had a clear shoulder upon which to bring her vehicle to a stop. We therefore find that Irving’s action in illegally parking his vehicle did form part of the chain of causation and thus was a cause-in-fact of the accident. Further, in parking illegally, Irving violated a duty imposed to prevent the risk of an accident because of the obstruction of the view of travelers on Highway 107 and motorists emerging from Sunrise’s parking lot. For these reasons, we find no error in the jury’s conclusion that Irving was partially at fault in causing the accident. However, for the reasons which follow, we find the jury’s allocation of fault between Isles and Irving clearly wrong.
It is well recognized that a trial court’s factual findings may not be disturbed by an appellate court absent clear or manifest error. A trial court’s findings as to percentages of fault are factual and therefore must also be upheld by the appellate court in the absence of clear or manifest error. Triangle Trucking Company v. Alexander, 451 So.2d 638 (La.App. 3rd Cir.1984).
In Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985), the Louisiana Supreme Court listed the following factors which should be considered by a court in determining the degree of fault assigned to each negligent party under La.C.C. art. 2323:
(1) the level of each actor’s awareness of the danger;
(2) the magnitude of the risk created by the conduct;
(3) the significance of what was sought by the conduct;
(4) the relative capacity of the actors; and,
(5) the presence of extenuating circumstances which might justify hasty action.
In the instant case, had Isles not overreacted to the emergence of Slocum’s vehicle onto Highway 107 by slamming on her brakes and failing to maintain control of her vehicle, the accident would not have happened. By the same token, Irving’s illegally parked vehicle partially obstructed Isles’ view and contributed to her erroneous assessment of the situation. Under the above enumerated factors, we find that Isles’ acts of negligence were equally as great as those of Irving in parking his truck in the “No Parking” zone. We therefore assign percentages of fault to the parties involved as follows:
Melody Gunter Slocum 0%
Audrey Isles 50%
David Irving 50%
QUANTUM
Irving’s final argument on appeal concerns the trial court’s failure to award him either general or special damages for the injuries which he allegedly sustained in the accident.
Following the accident, Irving got out of his truck from the passenger’s side and went around to inspect the damage to his vehicle. At no time did he complain to anyone at the accident site that he had been injured. After Trooper Rawlson completed his investigation, Irving unhooked and removed the glass rack from the back of his truck and drove home. He testified that later that night he developed a pain in his lower back and right hip. He noticed this onset of pain at around 10-11 p.m. Irving’s wife, Mary Kay Irving, testified that when Irving returned home after the accident, he complained to her that his back was “killing him”. The following day, Irving and an employee completed the *876 job which they had attempted to go to prior to the accident.
The following day Irving saw Dr. Banks, an orthopedic specialist. According to Irving, Dr. Banks treated him with pain medication. Dr. Banks saw Irving for his back condition on three other occasions, at which time Dr. Banks gave Irving medication and injections for pain. Irving testified that the injections gave him only temporary relief.[3]
Irving next consulted Dr. Ray J. Beurlot, Jr., an orthopedic surgeon, on December 20, 1984. Dr. Beurlot testified through video deposition that Irving complained of pain in his back, mainly in the lower portion, and stated that the pain commenced on the night of the automobile accident. X-rays taken of Irving’s lumbar spine revealed a narrowing or decrease in the inter-vertebral disc spaces at L5-S1, with some evidence of spurring. Dr. Beurlot explained that the evidence of spurring was indicative that Irving’s back condition was of long standing. On that visit, Dr. Beur-lot diagnosed that Irving sustained a back strain and had associated degenerative arthritic changes. Dr. Beurlot advised Irving to continue on the medication prescribed by Dr. Banks and undergo physical therapy to reduce the tightness in his back muscles. Irving received physical therapy treatment from January 9, 1985 through March 6, 1985.
Eugene Francis Noel, Jr., the physical therapist who treated Irving, testified that he treated Irving’s lower back area with moist heat, high voltage galvanic stimulation, and a combination of ultrasound and electrical stimulation. Noel testified that Irving appeared to derive some relief in January, but that in February, he complained of increased pain in his back. Noel stated that Irving obtained only temporary relief from the physical therapy.
On March 6,1985, Irving returned to Dr. Beurlot, with complaints of discomfort in his right lower back and hip. A CAT scan was performed which revealed no disc herniation, but did indicate bilateral spondylo-lysis of L4. Mild hypertrophic articular facet changes were also noted bilaterally at L4-5 and L5-S1. Dr. Beurlot ordered a lumbosacral corset for Irving to wear for back support and placed him on anti-inflammatory medication for his arthritis. Dr. Beurlot’s impression was that Irving was still suffering from acute back strain with degenerative joint disease.
Dr. Beurlot referred Irving to Dr. Naal-bandian, a neurologist in Alexandria. Although Dr. Naalbandian did not testify at trial, Dr. Beurlot related the results of the report which he received from Dr. Naalban-dian.[4] Dr. Beurlot testified that Dr. Naal-bandian concluded that Irving’s complaints of low back pain were not indicative of any lumbar or sacral nerve involvement.
Dr. Beurlot’s last examination of Irving occurred on February 25, 1986. Irving’s complaints of back pain were the same. X-rays revealed what appeared to be a spondylolysis, with a grade one to two spondylolisthesis, and a narrowing of the L4-L5 disc spaces. Dr. Beurlot explained in deposition that spondylolysis is a congenital or developmental condition, existing from birth. Spondylolisthesis, on the other hand, can occur at any point in time and can be caused either as a natural progression of aging or can be initiated by trauma if the spondylolysis is already present in the body. When asked if he believed that Irving’s back condition was caused by the accident, Dr. Beurlot stated:
“I can’t state that the accident caused the slippage. The accident can be a cause of aggravating the back, if the slippage preexisted, or it can to some degree cause the slippage, but without having an x-ray which shows the spondy-lolisthesis before the accident as being present, then there’s no way you can say at what point in time in this man’s life it occurred.”
Dr. Beurlot thereafter went on to state:
“I feel that his discomfort is coming from his spondylolisthesis at this time, *877 and by his history, if he was asymptomatic prior to the injury, then I’d have to conclude that the injury either aggravated a preexisting spondylolisthesis, with persistence of discomfort, or to some degree, some slippage occurred at the time of the accident and he’s persisted with discomfort.”
In summary, Dr. Beurlot stated that Irving’s back condition would prevent him from performing heavy manual labor and that Irving would experience pain upon bending, lifting, and carrying large objects. Dr. Beurlot assessed Irving’s condition with a 25% impairment rating of the whole body (the standard rating for this type of condition), and a 40% impairment of the back. Dr. Beurlot stated that future back surgery was a possibility, but that he would not recommend such in Irving’s case. Dr. Beurlot also testified that Irving had some arthritic change in addition to the spondylolisthesis.
Irving testified that since the accident, he has been plagued with persistent pain in his lower back and hip. He claims that due to the pain, he has been restricted in his work as a glass repairman/installer and has had to hire additional help to perform the tasks that he previously performed. Irving also testified that he is no longer able to fish and hunt or perform chores around the house.
Irving’s complaints of pain and physical limitations were corroborated at trial by his wife and stepdaughter. Byron “Bobby” Thevenot, an employee of Irving’s, testified that Irving is not capable of doing the work he had been doing prior to the accident. Thevenot stated that Irving has trouble bending, stooping and lifting large pieces of glass. Thevenot also testified that Irving arrives at work around 7:00 a.m. and works until approximately 4:30-5:00 p.m.
The record reflects that Irving was examined by a Dr. Phillips in New Orleans on two occasions following the accident, however, no evidence was presented at trial with regard to Dr. Phillips’ medical findings.
The jury returned a verdict making no award for either general or special damages. Irving asserts on appeal that he is entitled to $117,255.38 in special damages and $134,160.00 in general damages.
The burden of proving the existence of damages and causal connexity between them and the delictual act rests with the plaintiff. Such proof must be shown by a preponderance of the evidence. A mere possibility is not sufficient. Coco v. Richland General Contractors, Inc., 411 So.2d 1260 (La.App. 3rd Cir.1982), writ denied, 413 So.2d 909 (La.1982); Meyers v. Imperial Casualty Indemnity Company, 451 So.2d 649 (La.App. 3rd Cir.1984); Richard v. Walgreen’s Louisiana Company, 476 So.2d 1150 (La.App. 3rd Cir.1985).
It is a well settled rule of evidence that when a plaintiff is unable to provide a sufficient explanation why a treating physician’s testimony is not introduced, it is presumed that such testimony would have been adverse to his cause. Mills v. Sentry Insurance Company, 463 So.2d 20 (La.App. 5th Cir.1985), writ denied, 464 So.2d 1383 (La.1985); Chatelain v. United States Fidelity & Guaranty Company, 495 So.2d 379 (La.App. 3rd Cir.1986), writ denied, 498 So.2d 756 (La.1986).
In the case sub judice, the only medical evidence presented at trial was the testimony of Dr. Beurlot and the testimony of the physical therapist, Noel. There was no evidence presented concerning the treatment afforded Irving by Dr. Banks or the latter’s findings. No evidence was presented regarding the examinations and/or treatment by Drs. Naalbandian and Phillips. There is no explanation in the record for the failure of Drs. Banks, Phillips and Naalbandian to testify. Presumably, the jury applied the presumption above mentioned in reaching their verdict.
The trier of fact has much discretion in assessing the measure or amount of damages to be awarded to a plaintiff. It is only after an analysis of facts which disclose an abuse of discretion that the award may on appellate review, for articulated reasons, be considered either excessive or insufficient. Reck v. Stevens, 373 So.2d 498 (La.1979); Anderson v. Rabb, 484 So. *878 2d 196 (La.App. 1st Cir.1986), writ denied, 489 So.2d 248 (La.1986).
Presumably, in making no award in damages, the jury opined that plaintiff failed to prove by a preponderance of the evidence that he received any injury in the accident or that his present back condition, i.e., spondylolisthesis, was caused by the accident. We find no clear error in the latter determination, as Dr. Beurlot was unable to categorically state that the accident caused Irving’s spondylolisthesis without the benefit of x-rays taken prior to the accident. However, we do find that the jury committed clear error in failing to award Irving any damages. From the evidence presented at trial, despite the negative inference raised by Irving’s failure to produce testimony from some of his treating physicians, the record reflects that, as a result of the accident, Irving suffered a minor back strain which persisted, at least, until March of 1985. For such, he should have been compensated.
It is well settled that a jury may not refuse general damages to a plaintiff with objective injuries. Robinson v. General Motors Corp., 328 So.2d 751 (La.App. 4th Cir.1976); Moss v. Security National Insurance Co., 350 So.2d 247 (La.App. 3rd Cir.1977), writ refused, 352 So.2d 239 (La.1977); Napoli v. State Farm Mutual Automobile Insurance Co., 387 So.2d 1351 (La.App. 1st Cir.1980), writ granted, 392 So.2d 694 (La.1980), affirmed, 395 So.2d 720 (La.1981); Seegers v. State Farm Mutual Automobile Insurance Co., 188 So.2d 166 (La.App. 2d Cir.1966).
The record reflects medical expenses attributable to plaintiff’s back strain in the amount of $738.00. Further, in our view, the lowest award in general damages which could reasonably have been made by the trial court to plaintiff for the injuries which he received in the accident is $5,000.00. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). Plaintiff also seeks damages for economic loss allegedly caused by the fact that he had to hire additional help after the accident because he was no longer able to perform certain tasks. The record indicates that the labor costs for Dave’s Glass Company increased from $1,260.00 in 1984 to $9,581.67 in 1985. However, the record also reflects an increase in Irving’s gross income from $37,-211.45 in 1984 to $48,693.00 in 1985. Although Irving’s individual earning capacity may have diminished post-accident because of his inability to actively perform the work he did prior to the accident, it appears that this circumstance arose because of his back condition, spondylolesthesis, which the jury apparently concluded was not caused or exacerbated by the accident. We have found no clear error in this conclusion. Therefore, we find that plaintiff failed to prove any economic loss or diminished earning capacity. Accordingly, we itemize plaintiff’s damages as follows:
General Damages $5,000.00
Medical Expenses 738.00
TOTAL $5,738.00
Plaintiff is entitled to recover 50% of these damages, or $2,869.00.
For the above and foregoing reasons, the judgment appealed from is affirmed in part, amended in part, and recast to read as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiff, DAVID IRVING, and against defendants, AUDREY ISLES and STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, jointly, severally, and in solido, in the full sum of TWO THOUSAND EIGHT HUNDRED AND SIXTY-NINE ($2,869.00) DOLLARS, with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the demand of plaintiff, DAVID IRVING, against defendants, MELODY GUNTER SLOCUM and FIREMAN’S FUND INSURANCE COMPANY, is dismissed with prejudice.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the cross-claims and third party demands of all defendants are denied.
Costs of this suit, both at the trial level and on appeal, are assessed 50% to AUDREY ISLES and her insurer, STATE *879 FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, and 50% to plaintiff, DAVID IRVING.
AFFIRMED AS AMENDED.

. Irving’s pickup truck was rigged with a special rack which he used for carrying panels of glass for his business, Dave’s Glass Co., Inc.

. Although the evidence indicates that there was another truck parked alongside Irving’s vehicle, it would he highly speculative to conclude that Isles would have struck this vehicle had Irving’s truck not been parked where it was. Since the other truck was parked closer to the store, within a space of 22 feet of pavement, we can conclude that Isles would have had room (at least 10 feet) to pull her vehicle onto the shoulder of the road without striking this other vehicle.

. Dr. Banks did not testify at the trial of this matter nor were his medical reports entered into evidence.

. Although the reference to Dr. Naalbandian’s report by Dr. Beurlot was clearly hearsay, no objections were made when Dr. Beurlot’s video deposition was presented to the jury.